## HARDEN *v.* HAYS.

Where a will is proved by proof of the signature of a deceased subscribing witness, his declarations that the testator was incompetent at the time to make a will are admissible in evidence; for the proof of his signature is *primâ facie* evidence of the competency of the testator to make a will.

Where a subscribing witness declares his belief that the testator was *non compos* at the time, the party calling him may contradict him by reading his evidence taken on a former trial, and by proof of his declarations at other times.

And the evidence on the trial, and the contradictory statements of the witness, should all be left to the jury on the question of the capacity of the testator.

Where there is uncontradicted evidence of general insanity at a particular period, the *onus* of showing a lucid interval at the very time of the subsequent execution of a will lies on the party claiming under it. It is not sufficient that there is evidence of sanity before and after the day on which the will was made:

a jury cannot be permitted from such evidence to infer that a lucid interval intervened, during which the will was executed.

Improvements and expenditure on the faith of a contract within the statute of frauds, with the knowledge of the owner, gives no equity to the purchaser to retain possession until he is repaid.

Devise to A., he paying a certain sum, passes the fee without words of limitation.

In error from the District Court of Allegheny.

Abraham Hays, jun., the plaintiff in this ejectment, claimed title to the premises in question as devisee of John Hays, under an alleged will dated September 24, 1844, which had never been proved before the Register. J. and T. Harden, defendants, were two of the heirs of John Hays. And Jacob Hays, and his tenant, defendants, set up a contract of sale and a conveyance from John Hays.

The title to John Hays was derived under the will of his father in 1808, which declared, "as touching all such worldly estates wherewith it hath pleased God to bless me"—he devised, *inter alia*, the land in question "to his son John," and then directed him to pay a certain sum to the testator's daughter.

On the trial before HEPBURN, P. J., the plaintiff offered in evidence the will under which he claimed, and proved it was in the handwriting of S. Cochran, deceased, who was a subscribing witness, and whose signature was proved. Chessman, the other subscribing witness, stated that Cochran and himself were present when the will, which was read to John Hays, was executed; that John had had a fit the same afternoon, during which he was insensible. At the time of the execution he was stupid, and the witness said he would not have dealt with him at all, at that time, unless he wished to take advantage of him. The witness gave other testimony indicating his opinion of the incapacity of John Hays at the time, and said he did not recollect having, when examined previously, said nothing as to the incapacity of John, or that he believed him rational.

The court then, under exception, admitted proof of his previous testimony, in which the witness stated that John Hays was rational at the time of making the will, and in which the circumstances showing incapacity, as detailed by him on this occasion, were wanting. The plaintiff, under exception, also gave evidence of the contradictory declarations of the witness at other times.

The defendants then proved a commission *de lunatico inquirendo*, issued in December, 1844, with an inquest returned finding John Hays a lunatic for forty years past, with lucid intervals.

They then gave a great deal of evidence to show his incapacity

to transact business; and it was not contradicted that within a few weeks after the making of the will in 1844, he became entirely insane. They then offered to prove the declarations of Cochran, the deceased subscribing witness to the will, that John Hays was not in his right mind when it was drawn and executed, and that he regretted he had drawn it or had anything to do with it. This was rejected by the court.

The defendant, Hays, so far as it is material to state here, gave in evidence a contract of sale and deed, the execution of which was not sufficiently proved, and which could not be enforced under the statute of frauds. And that under this he had made improvements and expended money on the land.

The plaintiff then gave in evidence, under objection, a will made by John Hays on the 26th September, 1844, with evidence that at that time he was competent to make a will. (This will was invalid by reason of defects in the execution: Vide 6 Barr, 409.) They also proved the signature of Chessman to the will of September 24, and gave evidence to show the general capacity of John Hays, and particularly at intervals shortly before and after the date of the will in question.

His honour instructed the jury that Chessman's evidence was entitled to but little respect, from his contradictory statements; but as the plaintiff rejected so much of his present testimony as bore on the question of sanity, he rejected it altogether. The whole falls together, and is thus entirely repudiated. This being out of the case, and there being proof of the signatures of the subscribing witnesses—one being dead, and the other unavailable—the statute was satisfied, and there was *primâ facie* evidence sufficient to prove the will.

On the question of insanity, his honour instructed the jury that the finding of the inquest afforded a presumption against his sanity, but that there was evidence of his sanity at intervals before and after the date of the will. Under these circumstances, there being no direct evidence of his condition on the day, they were at liberty to draw from the facts such conclusion as they thought they warranted; and that it was for them to say, if he was insane before the execution of the will, whether anything short of evidence at the very time the will was made, would be sufficient to satisfy them against the double presumption of the inquisition and the evidence of previous insanity.

The defendant, Hays, requested instructions, that if there was a contract between himself and John Hays, for the purchase of

land, complied with by the defendant, and on the faith of which he had made valuable improvements and expended money, with the knowledge of John, though the deed was not regularly executed, and the contract could not be enforced under the statute of frauds, the plaintiff could not recover without indemnifying the purchaser for his expenditures. No answer was made to this, which is called his second point.

*Williams* and *Wood*, for plaintiffs in error.

*Forward*, contrà.

*Oct.* 6. ROGERS, J.—The plaintiffs in error, who were defendants below, have filed no less than twenty-four errors to the admission or rejection of evidence and the charge; all of which, it is believed, may be profitably reduced to some three or four prominent points, which it is my duty to notice.

The first point, which strikes at the root of the plaintiff's claim, if decided in favour of the defendants, would render an examination of the other errors entirely useless. It is, that under the will of Abraham Hays, sen., John Hays is entitled to an estate for life, and not in fee. The testator, after devising one-half of the same property, describing it, to his son Francis, proceeds:—"Item. I give and bequeath the remaining above-mentioned tract of land to my sons John and Thomas, in the following manner, to be equally divided between them, with a straight line drawn through the centre," &c. Did the question depend on this clause of the will, without the aid derived from other parts of it, it would pass but a life-estate, inasmuch as there are no words of inheritance attached to the devise. But we think there is a sufficient indication exhibited in other parts of the will to pass a fee simple. It is very evident, from the introductory clause, that the testator had no intention to die intestate; but that in this case, as in almost all others, he supposed he was devising his whole estate. "And, as touching such worldly estate, wherewith it has pleased God to bless me in this life, I give and dispose of the *same* in the following manner," &c. An heir at law can only be disinherited by express devise or necessary implication. Hence, in the construction of a will of doubtful meaning, every fair intendment is to be made in favour of the heir at law: 7 W. & S. 284. This is agreed; but a direction in form in a devise to pay a gross sum or sums of money, enlarges the devise to an estate in fee simple, where there are no words of limitation. But where there is any express limitation of

the interest devised, a direction that the devisee shall pay pecuniary legacies, does not make his interest a fee simple. Now, although the introductory words would not of themselves be sufficient to enlarge the devise to a fee simple, yet, coupled with the devise to Sarah, it has that effect. The testator says:—"Item. I give and bequeath to my daughter Sarah, all the property she now claims in the house or about the farm; likewise $150, to be paid out of that part of my real estate willed to my sons Thomas and John: (that is to say) John to pay $50; $25 at the expiration of one year after my decease; the other $25 at the expiration of the next year. Thomas to pay $50 per year, according to the same manner. John pays his." Here, then, is a plain direction to John to pay a gross sum of money out of the real estate devised to him, which of itself enlarges the estate; and, be it observed, there are no words of limitation restraining the legal effect of this provision. It is not to be supposed that the testator intended that the devisee should sustain a loss, as would be the case if the life-estate, which is possible, should expire before he was reimbursed the money he was directed to pay. Notwithstanding there are no words of inheritance, the intention must govern. Now, in this clause of the will, it is plain the testator supposed he had devised all his estate in the land to John. He directs him to pay the money out of that part of the real estate which he had willed to him. The necessary implication is, that he had devised his real estate; that is, all the interest, viz: a fee simple which he had in it. When the word "estate" is coupled with a devise of real estate, it is uniformly held to be a fee simple; and this is carrying out the intention of the testator, in ninety-nine cases out of a hundred. This point has decreased very much in importance since the act of the 8th April, 1833, 9th section, where the legislature wisely enacted that all devises of real estate shall pass the whole estate of the testator in the premises devised, although there be no words of inheritance or of perpetuity, unless it appear by a devise over or by words of limitation or otherwise, in the will, that the testator intended to devise a less estate.

The plaintiff having given evidence of the execution of the will by the subscribing witnesses, viz: by proving the handwriting of Samuel Cochran, and by the testimony of Charles Chessman, the defendants proposed to prove that Samuel Cochran, the witness to the will, in conversation with the witness said repeatedly that the testator was not in his right mind when the will was drawn and executed; that he regretted he had drawn it or had anything to do

with it, and that it ought to be burned or destroyed. The evidence so offered was rejected by the court, and this forms one of the prominent points in the case. This testimony, if true, would be decisive of the plaintiff's case. Its materiality cannot, therefore, be disputed. It is ·equally clear that, had Cochran lived and been brought to the stand, it would have been evidence of the most overwhelming character: Cowden v. Reynolds, 12 S. & R. 281. But it is said that inasmuch as he is dead, and his handwriting only proved, the evidence, from the accident of death, must be excluded. The opinion of the court is not without authority to support it, for the same point has been ruled in Stobart v. Dryden, 1 Meeson & Welsby, 615. The reasons on which the case was ruled are well summed up by Mr. Greenleaf, in his valuable Treatise on Evidence, vol. 1, p. 216, § 126. Such testimony was overruled by the court, "Because the evidence of the handwriting in the attestation is not used as a declaration of the witness, but is offered merely to show the fact that he put his name there in the manner in which attestations are usually placed to genuine signatures, and the second chiefly because of the mischiefs which would ensue if the general ·rule excluding hearsay were thus broken in upon ; for the security of solemn instruments would thereby become much impaired, and the rights of parties under them would be liable to be affected at remote periods by loose declarations of the attesting witnesses, which could neither be explained nor contradicted by the testimony of the witnesses themselves. In admitting such declarations, too, there would be no reciprocity ; for although the party impeaching the instrument would thereby have an equivalent for the loss of his power of cross-examination of the living witness, the other party would have none for the loss of his power of re-examination." That there is force in the reasoning of the court, I am not disposed to deny, although I cannot agree to the first reason assigned. It is not true at least in this state, where *subscribing* witnesses are not required to a will, that the evidence of handwriting in the attestation is offered merely as the declaration of the fact that he put his name there in the manner in which attestations are usually placed to genuine signatures. On the contrary, proof of the handwriting of a deceased subscribing witness is not merely evidence that he attested the will, but it is also proof of the sanity of the testator. It is evidence of that assorted fact, because the principle of law is, that no man would attest the will of any but a sane person of sound, disposing mind, memory, and understanding. On such evidence, without more, a will must be admitted to probate. It is in

effect the attestation of the witness that the testator was sane. In
Hays v. Harden, 6 Barr, 409, it is ruled that proof of the hand-
writing of the subscribing witness to a will, when the witness can-
not be called, is equivalent to his oath to the signature of the
testator. On this point several cases have been ruled, some closely
analogous, others directly in point. Indeed, I do not understand
it to be denied, that you may give evidence of the general character
of the witness for truth and veracity to impeach or lessen the weight
due to the attestation. Nor can it be questioned, in this state at
least, after the decision of the case of Crouse v. Miller, 10 S. &
R. 155, in which it was held that where book entries were given in
evidence on proof of the handwriting of a deceased or absent wit-
ness, his character either for truth or honesty might be impeached
for the purpose of destroying their credibility. This, it is true,
is not the very point, but it is analogous to the case in hand. It is
admitted by Baron Parke that a contrary doctrine had been ruled in
some cases in England, although very limited, as he says, indeed, in
point of number. It was so ruled by Lord Mansfield, in Wright
v. Littler, 3 Burrows, 1244; by Justice Heath at Nisi Prius; recog-
nised and approved by Lord Ellenborough; and to this let me add,
by Bayley, J., in Doe v. Ridgway, 4 Barn. & Ald. 55. He (the
attesting witness to a bond), Justice Bayley says, must have been
called if he had been alive, and it would then have been competent
to prove, by cross-examination, his declarations as to the forgery
of the bond. Now the party ought not, by the death of the wit-
ness, to be deprived of obtaining the advantage of such evidence.
The same may be said of 5 Bing. 435. The weight of authority
at the time of the decision of Stobert v. Dryden, was all on one
side, and opposed to the doctrine of that case, which evidently was
ruled on the ground of the dangerous character of the testimony.
In Lossee v. Lossee, Executors, 2 Hill R. 609, the Supreme Court
of New York held that where an instrument is read in evidence on
proof merely of the handwriting of the attesting witness, the
adverse party may give evidence of the witness's bad character at
the time of attesting, and show his subsequent declarations that the
instrument was a forgery. Chief Justice Nelson, who delivered
the opinion of the court, cites many cases in which the same doc-
trine is held. The point came incidentally before the court in
Fox v. Evans, 3 Yeat. 506. There the declarations of one of the
witnesses to a will, who was out of the state and had not been
examined, was properly overruled; but it is evident from the
remarks of the court, that if his handwriting had been proved, evi-

O

dence of his declarations to impeach him would have been received. For when a party rests on his testimony, it is open to attack either by proof of his general character, or by proof of his repeated declarations. The same point has also been ruled in McElwee v. Sutton, 2 Bailey S. C. Rep. 128. There a deed was introduced on proof of the death and handwriting of one Vail, the attesting witness, whereupon the opposite party offered to show that Vail had frequenty said the deed had been ante-dated to protect the property from creditors. The evidence was rejected, and for this cause, among others, a new trial was awarded. O'Neil, J., who delivered the opinion of the court, after remarking that the presumption arising from the attestation in question might be overcome, added: "To do this nothing can be more satisfactory than to show that the witness himself had said, 'Although I witnessed the deed, yet I know it does not bear its genuine date, but was ante-dated to save the property.' *This is in effect a contradiction of the testimony which the law presumes him to give.*" In North Carolina, where trespass was brought for killing a slave, it was held that the slave's good character was admissible to repel the presumption of his improper conduct: Pierce v. Myrick, 1 Dev. Rep. 345. So in Gardenhire v. McDaniel, 2 Yerger, 23, and Vandyke v. Thompson, 1 Harrington, 109, the same point was presented for decision in the case of deeds which had been proved by the subscribing witnesses and subsequently recorded; and it was in both instances determined that evidence of their bad character might be given for the purposes of showing the instruments were forgeries. In that class of cases the question becomes of primary importance: Vide notes to 2 Hill, 612, and 1 Mceson & Welsby, 615. From this array of cases, it must be agreed that on this side of the Atlantic at least, the weight of authority is decidedly in favour of the admission of the testimony. It is said that if any declarations, at any time, from the mouth of subscribing witnesses who are dead, are to be admitted in evidence, the result would be that the security of solemn instruments would be much impaired. The rights of parties under wills and deeds would be liable to be affected at remote periods by loose declarations of attesting witnesses, which those parties would have no opportunity of contradicting or explaining by the evidence of the witnesses themselves. I admit there is force in this view of the case, and that such testimony calls for vigilance and strict scrutiny, but I cannot agree that this is a reason for the exclusion of the testimony altogether, thereby, in many cases, destroying the possibility of exposing fraud, forgery, and villany of every descrip-

tion, so apt to be practised on persons of weak understandings, particularly when debilitated by sickness and disease. It is better that we should incur the risk mentioned, than that we should sanction fraud and imposition. The remarks of Baron Parke show a distrust of courts and juries, and if pushed to an excess would be an argument against all testimony whatever, which we all know has and will continue to be abused; but that would be a flimsy reason for excluding it altogether. Human testimony may be uncertain, yet its introduction is a necessity with which we cannot dispense. Courts and juries will make the necessary allowances so as to attain the ends of justice by extracting the truth from the attending circumstances. The result of this novel doctrine, for it is nothing less, it seems to me will be to produce this result, that a man who has a valid title to-day, by the accident of death will have none to-morrow. To obtain this questionable benefit it is hardly worth while to overturn a current of authorities establishing a different principle. And be it remarked, not a solitary case to the contrary has been cited on this side of the Atlantic. And that the admission of the evidence is better calculated to attain the ends of justice, would also appear from this, that the same principle must be extended to cases where the subscribing witness is out of the jurisdiction of the court. It is not difficult to see how easy it would be to spirit away a subscribing witness on the eve of trial, prove his handwriting, thereby giving full effect to his testimony, and then excluding all testimony of his repeated declarations, that the bond or will was a forgery or a conspiracy to cheat or defraud. Establish this doctrine, and we shall not be without instances of attempts to baffle justice by removing the witness, and thereby prevent the introduction of proof, which the guilty know would destroy their claim. I have, therefore, come to the conclusion we shall better attain the ends of justice by adhering to the law as established, than by adopting fanciful theories, although supported by the authority of some of the members of the Court of Exchequer of acknowledged ability and talents.

I now proceed to notice another point in the case. There were two subscribing witnesses to the will, Samuel Cochran and Charles Chessman. Charles Chessman was examined as a witness for the plaintiff. He proved that he signed the will as one of the subscribing witnesses, and that he saw the testator execute it. On that point there was no dispute: the matter in controversy was as to the sanity of the testator. On the latter point the result of his testimony was, that at the time the will was executed the testator was

not of sufficient capacity to dispose of his estate.    After describing his condition, which, if true, is inconsistent with the idea of a sound disposing mind such as the law exacts ; the witness says, "At the time the Cochran will was written, I would not have dealt with him at all, unless I wished to have taken advantage of him."    This witness, be it remarked, had been examined before, and had given testimony at variance with this evidence.    The question then is, whether, under this state of facts, the plaintiff was at liberty to examine him as to his testimony on a former occasion, and to give in evidence the testimony then given.    And that he had this right is ruled in Cowden v. Reynolds, 12 S. & R. 281, and in The Bank of the Northern Liberties v. Davis, 6 W. & S. 289.    It is true, as a general rule, a party who calls a witness shall not be permitted to discredit him, on finding his testimony is against him.    But this rule admits of exceptions, of which this case presents an instance.    On the authority of the cases cited, we see no objection to the course pursued in allowing the cross-examination of the witness, and in admitting proof of the evidence given by the witness when he was examined before.    We see no error in permitting the plaintiff to examine the witness as to what he had testified to before, respecting the sanity of the testator, &c., nor in admitting in evidence the notes of the testimony of the witness on a former trial.

But then the question recurs, what was the duty of the court after the evidence was given ?    It was to submit the whole evidence of the witness on this as well as on the former trial to the jury, and leave it to them to say whether the evidence proved that the testator was sane at the time the will was executed, with, however, a strong expression of opinion, that under the circumstances in which the witness had placed himself, very little credit ought to be attached to his testimony, whether given before or on this trial. But instead of pursuing this course, the court undertook to decide that his testimony was entirely repudiated, to admit evidence of the handwriting, and to give it the same efficacy as if the witness had been dead or out of the jurisdiction of the court.    The court in the charge say, "The plaintiff has contradicted his own witness, and, I think, shown pretty distinctly that he is entitled to but little respect at the hands of either court or jury.    The plaintiff discards wholly that part of his testimony which speaks of the capacity of the testator, and in so doing, he utterly repudiated the whole of the testimony of the witness, 'for he cannot set up so much of his witnesses' testimony as makes for him, and reject or disprove such as is of a contrary tendency.'    The whole falls together, and his

testimony is thus entirely repudiated: 6 W. & S. 288. The testimony of Chessman being out of the case for any purpose available to the plaintiff, have we the requisite proof of this will by two competent witnesses? Chessman's testimony being wholly discarded, I think he must be considered as standing in the situation of a witness whose testimony or attendance cannot be procured, and that the next best evidence must be resorted to, namely, that of proving his handwriting. One of the subscribing witnesses being dead, and the other unavailable, their handwriting must be proved; and if done to the satisfaction of the jury, the execution of the will is *primâ facie* established, and the law requires no further proof on this point." The idea that Chessman's testimony was repudiated, is derived from an expression in The Bank of the Northern Liberties *v.* Davis, taken from Lowe *v.* Jolliffe, 1 Black, 363, but not there used in the sense attributed to it in the charge, and certainly not intended to justify the court in considering the testimony so much out of the way as to introduce secondary evidence of handwriting, giving the same all the effect it would have had, if he had not been examined in consequence of death, or being out of the jurisdiction of the court. The course pursued by the court was a wrong to the defendants, and it deprived them of the benefit of Chessman's testimony, which, if believed, unquestionably proved that the testator was not in a fit condition to execute a will.

It is now contended the court erred in charging the jury that they may find the testator sane at the execution of the will, from his condition before and after that time. This point is predicated on the fact being found by the jury, that before and after the 24th September, 1844, there was a general imbecility or derangement in the mind of the testator. That he was deranged after that date, was proved by the most irresistible evidence; but whether before, is most strenuously denied. It is admitted on the part of the plaintiff, that John Hays was a man of weak intellect; but it is denied that he was a lunatic or of unsound mind until within a few months of his decease, when, it is conceded by all parties, he was entirely deranged. In proof of his derangement before the execution of the will, the defendants gave in evidence a commission of lunacy, issued in December, 1844, and inquisition finding John Hays a lunatic, with lucid intervals, and that he had been a lunatic for forty years before that time. The defendants rely on the inquisition, with other proof, to support the allegation of general imbecility of mind. The inquisition is *primâ facie* evidence of

the facts found by the inquest, but not·conclusive.   And whether
a general derangement is proved before the date of the will, is an
important fact to be determined by the jury.   The presumption of
law is, that the testator is sane until the contrary is shown; but
when a general imbecility of mind is proved, the burthen of proof
is thrown upon the opposite party, who must show that it was exe-
cuted in a lucid interval, and when the testator had understanding
and capacity sufficient to execute the will.   Supposing the jury should
believe that the testator was of unsound mind before the execution
of the will, then the important question arises as to the nature of
the proof the law requires.    On this point, the court charged in
effect, that if the evidence established the fact that there was a
lucid interval both before and after the day of the date of the will,
the jury was at liberty to say that he was sane at the time the will
was executed, in the absence of proof of his situation on that day,
even against the double presumption of the inquisition and the
evidence.    From this principle I take leave to enter my dissent.
This principle is founded on the notion, contrary to the current of
the decisions, that a lucid interval is presumed to continue; whereas
it is well known, that a man insane may be well to-day, insane
to-morrow, better the next day, and hopelessly diseased the third.
To allow the jury to make such an inference would be most unsa-
tisfactory, and may lead to great imposition on that unfortunate
class of persons, who need so much the protection of the courts.
Fraud would be the inevitable result, as the artful and designing
would seize the proper time, when the mind was prostrated by dis-
ease, to obtain from them a disposition of their estate.    The very
fact that no evidence is given bearing on the act of execution, is
sufficient to expose its dangerous tendency and its certainty to
mislead.    It certainly imposes no hardship to require that, under
such circumstances, evidence of the most unexceptionable kind and
character, bearing on the very act of disposition, and confined to
the time of execution, should be given.    Stringent rules only can
protect persons placed in this melancholy condition.    It is much
better, in this country at least, where the law makes an equal dis-
tribution of estates, that a person should die intestate, than to
expose them to the risk of imposition and fraud, at the instance
of persons interested to deceive them.    In Harrison v. Rowan,
3 W. C. C. Rep. 586, Washington, J., says, "The soundness of
the testator's mind is to be judged of from his conversation or
from his actions, at the time the will is made, or from both taken
together."    Again, he says, "It must also be remembered that the

fact of competency is to be decided by the state of the testator's mind when the will was made. And although evidence of the state of his mind and of his bodily health, before and after that time, may be given, in order to shed light upon its condition at that period, still such evidence is no otherwise to be regarded. For although it should be proved, that at a prior or subsequent day, he was incapable of making a will from the effect of a temporary cause—such as fever and the like—it will not follow that he was so when the will was executed." The converse of this proposition is equally true; for where a man is a lunatic, it does not follow he has a lucid interval from proof that he was sane before and after a certain period. To the same point is the case of Stevens et Ux. *v.* Vancleve, 4 W. C. C. Rep. 262. The only point of time, as is there said, to be looked to by a jury who are to decide on the competency of a testator to make a will, is *that* when the will was executed. Also, Lessee of Hoge *v.* Fisher et al., Pet. C. C. Rep. 163. In Dodge *v.* March, 1 Hag. 612, Sir John Nichols, speaking of a case in many of its features closely resembling this, says, unless the court is prepared to give up all the principles heretofore acted upon, it must demand the most decisive proof of the complete absence of influence and excitement at the preparation and making of this asserted will; it must require unimpeachable evidence of unbiassed volition and of clear capacity. It must, in fact, expect to be shown instructions coming from the deceased himself, and an execution in the presence of witnesses above all suspicion. It will be for the jury to say whether proofs of these indispensable requisites are or are not wanting at the time of the *factum* of this will. If the jury should believe that the testimony of Chessman does not clearly show that the testator was, at the very time of the execution of the will, of a sound disposing mind, memory, and understanding, it is an invalid instrument, and the plaintiffs cannot recover. The case depends on the testimony of the subscribing witnesses, who alone were present and know the state and condition of the testator at the time of the *factum* of the will. In connexion with the question on the execution of the will, it was the duty of the court to charge, as they were requested, that if they believed the testator was of weak mind, and unable to read, the jury should be satisfied that he was acquainted with the contents of the will. It is not necessary for the devisee to prove to the jury that the will was read in the presence of witnesses. In general, this is to be presumed. But if the testator is blind or incapable of reading, or if a reasonable ground be laid for be-

lieving it was not read to him, or that there was fraud in the transaction, it is for the devisee to satisfy the jury that the will was read, or that the contents were known to the testator: Harrison *v.* Rowan, 3 W. C. C. Rep. 580.

We see no error in admitting in evidence the will of the 26th September, nor the testimony in relation to it, nor in asking Chessman whether John Hays was rational or otherwise, at the time Cochran was there to draw his will. The evidence had a bearing on the fact of sanity, which is a disputed fact in the case.

The counsel for John Harden complained that the court did not answer their second point. But, from the omission, they have received no injury. The court ought to have answered it in the negative; for, admitting all the facts to be as stated, it is no defence to the action, as was ruled in Reed *v.* Reed, decided at this term. If the defendants have a remedy, it is by action, and not by a detention of the possession.

Judgment reversed, and a *venire de novo* awarded.