## DeLaurentiis's Estate.

Argued April 27, 1936.   Before KEPHART, C. J.,
SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*George Maxman,* of *Di Silvestro & Maxman,* with him
*C. James Todaro,* for appellants.

*Joseph D. Morelli,* for appellee.

OPINION BY MR. JUSTICE STERN, June 26, 1936:

Angelo DeLaurentiis came to this county as an immigrant, and by years of grueling toil and laborious saving accumulated property consisting of money in bank and cash of about $19,000 and his house of a value of $1,500. He lived in most penurious style and in a condition described by witnesses as one of squalor. He died quite suddenly on April 7, 1934. A few days thereafter a will purporting to have been executed by him on March 28, 1934, was probated. The salient features of this will were that it appointed Vito M. Baldi, an undertaker, sole executor, and provided that the testator's funeral should cost not less than $3,500, that it should be followed by a band costing not more than $100, and that there should be flowers at a cost not to exceed $200. After bequests of $100 to a church in Italy, $500 for the funeral expenses of a friend, $500 to a distant cousin, and the proceeds of the sale of his house in equal shares to a hospital and a church, all the remainder (and therefore the great bulk) of the estate was to be devoted to the erection of a mausoleum upon his burial lot.

The Italian consul general, on behalf of decedent's heirs, nieces and nephews living in Italy, filed an appeal from the action of the register in probating the will, it being asserted that the signature was a forgery. A hearing was had in the orphans' court and an opinion filed dismissing the appeal. From the final decree of the orphans' court the present appeal was taken.

The testimony is exceedingly voluminous and it would not serve any useful purpose to summarize it in detail. In brief, proponents offered testimony to the effect that DeLaurentiis consulted a member of the bar (not the present counsel of proponents) and instructed him as to his wishes in regard to the will. This attorney made memoranda from which he prepared the will, and after reading it to the testator the latter signed it, and the

attorney and one Vincent Farina added their names as witnesses. At testator's request the attorney kept the will and after testator's death turned it over to Baldi who until that time had not known anything about it.

The case presented by contestants was based partly upon the improbability, because of its own provisions, that the will was genuine, and partly upon direct testimony indicating conspiracy between the attorney, Baldi and Farina, the purpose and the result of which was the forgery of the will. As far as the will itself is concerned, contestants pointed out that practically the entire estate, comparatively a substantial one, went to funeral and mausoleum expenses, the cost of the funeral (from which, of course, Baldi as undertaker would profit) being stipulated as an extremely high minimum. It was further pointed out that the decedent owned a farm and small country house in Italy, which had been in the possession of his sister and after her death of his niece, but the will makes no provision in regard to this property; that there were four Roman Catholic churches in the town in Italy mentioned in the will, as the decedent well knew, but the will does not designate the one to receive the bequest of $100; that the provision of $500 for the payment of the funeral expenses of the decedent's friend Marcello Ciclamini is conditioned upon the latter dying within the City of Philadelphia,—a peculiar limitation which apparently would be in the interest of Baldi as a local undertaker; that the gift of $500 to Giliberto De-Laurentiis is strange in view of the fact that the decedent had been estranged from him and had not spoken to him for a period of 18 years; that, as contestants asserted, the decedent had been on good terms with his relatives, including the heirs in Italy, but did not mention nor provide for them; that he had close friends to whom he did not say anything about the alleged will; that Baldi was merely a casual acquaintance of decedent,—at least not an intimate nor a person who, by reason of social or business relationship, normally would be

selected as executor; that the final clause of the will, couched in peculiar English, purports to explain the unusual provisions of the will by the statement that testator's life had become miserable as a result of the treatment received by him at the hands of his relatives, whereas, in fact, there was no justification whatever for such an assertion; and, finally, that the memoranda of instructions alleged to have been made by the attorney did not conform with the terms of the will as drafted.

As to direct evidence offered by contestants, the main witness presented was one John V. Porreca, who testified that on the evening of April 7, 1934 (the day of decedent's death), one Thomas Gagliardi, who was a liveryman for Baldi, came to Porreca and asked him to see Baldi; that he went with Gagliardi to Baldi's house and there met Baldi and Farina; that Baldi told him he wanted him to witness a will and showed him what apparently was the will of DeLaurentiis as now probated, but which was then unsigned. Porreca refused to attach his name as a witness unless it were signed by the testator in his presence. Baldi thereupon offered to let him be present when the will was signed and took him to the house of DeLaurentiis. When they came there a crepe was already on the door, whereupon Porreca told Farina and Baldi that they were "taking an awful chance." He further testified that Baldi went through a trunk in which decedent kept his possessions and took out a wallet containing several hundred dollars. They then went back to Baldi's office, found the attorney there, and Porreca was again urged to witness the will, but he refused although they told him that $3,000 could be made out of it. Porreca's testimony further intimates that the name of the testator was affixed to the will by being copied in imitation of decedent's signature to an agreement of purchase of his house some thirteen years before, this agreement having been found in decedent's trunk and removed by Baldi.

There were some obvious inconsistencies in Porreca's testimony, and Farina and Baldi both denied all of his statements concerning them. It appeared that from ten to twenty years prior to the hearing Porreca had been convicted of several crimes. On the other hand, it was admitted by proponents that Baldi and Porreca had known one another during a long course of years and had had numerous real estate transactions together. Moreover, Porreca seems to have been an unwilling witness, because he refused to obey the subpœna of proponents and it was necessary to issue an attachment and have him confined in prison until the day of the hearing. It furthermore appears that while he was thus being held Gagliardi caused a warrant to be issued for him, and in the hearing before the magistrate Baldi testified against him in regard to an alleged retention by Porreca of certain moneys arising out of a real estate venture. Subsequently, in quarter sessions court, Porreca was acquitted. This incident bears some imprint of intimidation aimed to dissuade Porreca from testifying against proponents in the hearing in the orphans' court.

Contestants presented as witnesses two handwriting experts who have testified frequently in the courts and are of recognized professional standing, both of whom were positive in the opinion that the alleged signature to the will was not that of decedent. One of these experts did not examine the signature to the agreement of purchase, but the other, who did make such an examination, testified that in his opinion the signature attached to the will had been forged in imitation of that appearing on the agreement of purchase found by Baldi in testator's trunk, although in the thirteen years elapsing since the date of that agreement decedent's signature had undergone the usual changes which might be expected during that span of time. This testimony was in striking corroboration of that of Porreca.

While it does not throw any relevant light upon the issue here presented, it is somewhat worthy of note that

on the day the will was probated by Baldi he drew from the decedent's deposit in the savings fund $5,000 in cash, out of which, according to his testimony, he paid himself a funeral bill of $4,200, paid $300 for flowers and for the band, and personally retained the remaining $500, as to which he offered no explanation.

As a rebuttal witness, proponents produced a salesman for a concern selling memorial monuments, who testified that he had been in negotiation with decedent for the erection of a mausoleum to cost between $10,000 and $11,000, and had prepared preliminary plans and sketches which decedent approved a short time before his death, telling the witness that if he, decedent, "was not living he would have someone to take care of it."

The first question arising in the case is as to the admissibility of the testimony of the handwriting experts. Received in evidence at the hearing in the orphans' court, it was held in the final adjudication that this was error, although the court declared that even if this testimony were considered with all the other evidence in the case there was not sufficient in the record to establish the substantial dispute upon the question of the execution of the will which alone would warrant the granting of an issue.

In *McWilliams's Est.*, 259 Pa. 526, 532, the rule was stated to be that expert testimony of this kind cannot be received as independent testimony but only "as corroborating other direct or positive evidence as to some fact in issue." This is more satisfactorily expressed in *Henry's Est.*, 276 Pa. 511, 513, where it is said that: "The trial court based its refusal of this issue upon the ground that the opinion evidence, *standing alone,* as it did, would not sustain a finding of forgery, in the face of the direct and credible evidence. This accords with our decisions. . . . Were the direct evidence discredited, or the opinion evidence strengthened by facts and circumstances, the case might be different."

This question therefore leads to, and merges in, the more basic inquiry, whether the evidence of the witnesses who testified that they saw the actual writing of the signature by decedent was so credible and trustworthy as to overcome all opposing evidence, and whether, taking into consideration the will itself, the surrounding facts and circumstances, and the direct evidence of forgery produced by contestants, their case was nevertheless so weak that the orphans' court was justified in refusing to award an issue.

We are not unmindful of the heavy burden that must be assumed by an appellant in attempting to establish that the orphans' court erred in holding that, considering all the evidence presented, an issue should not be awarded. As applicable to these cases the principle is laid down in unmistakable though variously expressed terms, that a party is not entitled to have an issue submitted to a jury merely because he produces enough evidence to make out technically a prima facie case.

"The true rule is that such a case should not go to the jury at all when the court in the exercise of a sound legal discretion would not sustain the verdict": *Eddey's App.*, 109 Pa. 406, 419.

"If the testimony is such that after a fair and impartial trial, resulting in a verdict against the proponents of the alleged will, the trial judge, after a careful review of all the testimony, would feel constrained to set aside the verdict as contrary to the manifest weight of the evidence, it cannot be said that a dispute, within the meaning of the act, has arisen": *Appeal of Knauss,* 114 Pa. 10, 20.

". . . there must be an abuse of discretion by the hearing judge sitting as a chancellor when an issue is refused, before this court will reverse. It is his duty, after weighing the evidence impartially, to refuse to present the question to a jury, unless he feels the ends of justice call for a verdict against the will, or he is so

uncertain on this point that he could conscionably sustain a finding either way on one or more of the controlling issues involved": *Mark's Est.,* 298 Pa. 285, 286.

"In reviewing the action of the lower court in such a case, the matter for our determination is not necessarily whether we agree with the decision of the chancellor upon the merits, but rather whether we believe a judicial mind, in view of the relevant rules of law applicable to the particular case and on due consideration of the evidence as a whole, could reasonably have reached the conclusion of the court below": *Fink's Est.,* 310 Pa. 453, 456.

"As the rule is usually stated, an issue should be denied in a case where, after a careful consideration and review of all the evidence, the trial judge would feel compelled to set aside a verdict, if found for the petitioner, as impossible and improper on the strength of the evidence, . . . To sustain the grant of an issue, the evidence must be such as would permit a verdict for either party to stand. Otherwise, there is no substantial dispute upon a material question of fact": *Hile's Est.,* 310 Pa. 541, 544.

"We have repeatedly held that in reviewing a chancellor's refusal of an issue devisavit vel non the question for the appellate court to decide is not whether it would have reached the same result had it been acting as chancellor, but rather whether a judicial mind, on due consideration of the evidence as a whole, could reasonably have reached the conclusion of the chancellor: *Tetlow's Est.,* 269 Pa. 486; *Fink's Est.,* 310 Pa. 453. As we said in *Tetlow's Estate,* 'When the answer to this question is in the affirmative, the judgment appealed from will not be disturbed.' In other words, the chancellor's decision will not be reversed unless an abuse of discretion on his part appears": *Dible's Est.,* 316 Pa. 553, 554.

Without any desire to depart from the rigidity of the rule as thus firmly established, it must be borne in mind

that the judge of the orphans' court conducting the hearing is not to constitute himself the jury, that is, to decide the case as he would if acting in the capacity of an ultimate fact-finding tribunal. His function is to decide whether there is a substantial dispute upon a material matter of fact, and such a dispute exists if a verdict that might be reached by a jury, even if at variance with his own opinion, would not have to be set aside as judicially untenable because contrary to the weight of the evidence.

This court is of opinion that a review of all the evidence in the present case leads to the conclusion that there was an abuse of discretion on the part of the orphans' court in refusing to award an issue and thus enable contestants to present their case to a jury. The provisions of the will in themselves require that its authenticity should be made the subject of careful investigation. The testimony would not indicate that Baldi and decedent were close acquaintances, but, on the contrary, there were friends to whom he was much more deeply attached. The executor is an undertaker, and practically the entire estate is to be consumed in the expenses of a funeral and the building of a mausoleum. The testator's relatives, with whom, according to apparently credible evidence, he was on good terms, were wholly ignored. These and other features of the will casting doubt upon its genuineness have already been discussed.

Moreover, there is the direct and positive evidence of Porreca that the will was not prepared and the signature attached until after decedent's death, and while there may be doubt as to the credibility of this testimony because of some inherent contradictions and because of the early criminal record of the witness, it is also true that Baldi and Porreca had been associated in various business transactions for many years, and that Porreca had to be brought into court by compulsion. Added to his testimony is that of the handwriting experts who, under exhaustive examination and cross-examination, pro-

duced what may fairly be characterized as not only plausible but reasonably convincing evidence that the alleged signature was an attempted imitation of a signature of decedent attached many years before to a document which had come into Baldi's possession.

It may, of course, be true that Porreca's testimony is a fabrication, that the handwriting experts are mistaken, and that the seemingly strange provisions of the will are susceptible of satisfactory explanation, but if under such circumstances and evidence a contestant is not to be allowed to have a jury pass upon his case, it would apparently be impossible to secure the opportunity of establishing that an alleged signature to a will was in fact a forgery, it being only in the rarest cases that direct and irrefutable testimony of a witness to the very act of forgery could be obtained. Considering the personnel of the witnesses, this seems to be peculiarly a case to which there may properly be applied the statement of the court in *Sharpless's Est.,* 134 Pa. 250, 261, that: "So much depends on the means of knowledge, the interest or bias, the manner, the character, and the personal weight which each witness carries as an individual among his neighbors and in the community, that a jury is the only appropriate tribunal, in such a case, to determine which way the balance inclines. Having the testimony present to their eyes as well as their ears, the truth may be made manifest beyond any substantial doubt; and the judge, who will have the same advantage, will still have the final result within his control. To decide it now, as presented, would be to decide it in the dusk, if not in the dark, when full daylight is at hand."

The decree of the orphans' court is reversed, and the appeal from the decision of the register of wills reinstated, with directions to award an issue to the court of common pleas to try by jury the question of fact as to whether or not the signature affixed to the alleged will of Angelo DeLaurentiis is a forgery; costs to abide the result.