Kline's Estate.

Argued May 27, 1936. Before KEPHART, C. J., SCHAF-
FER, MAXEY, LINN, STERN and BARNES, JJ.

*Andrew Hourigan,* with him *Maurice S. Cantor,* for appellant.

*Peter J. McCormick,* for appellee.

OPINION BY MR. CHIEF JUSTICE KEPHART, June 26, 1936:

Frank J. Kline died, leaving property worth some $17,000, which by· will, with the exception of a small bequest for masses, was given to Ruth McAlarney, with whom he had boarded for a few years. A niece of decedent appealed from the probate of the will challenging the signature, which appeared by mark, as a forgery. In her petition she asked for an issue to the court of common pleas to try by jury the authenticity of the instrument. The court below refused this request.

The decedent, Frank J. Kline, during his life was an educated, intelligent and well-informed man, and, although the execution of a will by mark is not rare, it is most unusual for a person of his background to sign in this manner. This circumstance does not invalidate the will, but as the ordinary means of testing the genuineness of the signature is wholly absent, it does call for the closest scrutiny by the court if questioned, especially when· other circumstances cast a cloud of suspicion about it.

The will was dated July 2, 1935; decedent died July 13. The contestant established by the teller of the Miner's National Bank that decedent had been in the bank on June 21, 1935, eleven days before the will was supposed to have been signed, and had withdrawn $100. At that time he was unaccompanied, and saw well enough to sign the withdrawal slip. The signature on this slip, as it appears in evidence, is well written. It was also shown that during the month of June, and until a day or so before his death, decedent's physical and mental condition remained practically the same. Though he had been in poor health for some time, he took daily walks

and was seen outside his apartment on July 5 or 6, unaccompanied. His general appearance at that time was the same as usual. This was after the will was supposed to have been executed. Decedent had always been able to dress himself and eat without assistance. He read with the daughter of his landlady and discussed with her topics of interest. These circumstances should have immediately challenged the attention of the hearing judge who overlooked their significance.

Attorney Brennan, who was personal counsel for Mrs. McAlarney's husband, was the scrivener of the disputed will. While Mrs. McAlarney disclaimed any knowledge of its execution or of its existence prior to the death of the decedent, she remarked to a neighbor immediately thereafter that it was "all fixed" and that his relatives (nephews and nieces) could not "take it away" from her. The signature to the will and the attestation were written in different colored inks with different pens. It is alleged to have been executed July 1, and witnessed July 2, but as to the latter date there is a contradiction in the testimony of the subscribing witnesses, a barber and his wife. These were the only persons to testify that decedent could not see well enough at that time to sign his name, though the evidence clearly shows there was no change in his eyesight from June 21, the date when he signed the withdrawal order at the bank, to the date of his death. No medical testimony purported to suggest that his vision was insufficient during that period to enable him to attend to his ordinary affairs. In fact, no doctor was employed to care for him during his last illness, and, although he was a Roman Catholic, no priest was called. The decedent, with his landlady and her husband, lived in an apartment house. All of the other residents testified that they had never seen either of the subscribing witnesses in the apartment before Frank J. Kline's death. After that they were seen there very often. The curious thing about it all is that this was the only paper ever executed by the decedent

with his mark, and yet it was his most important document.

What became of the will between July 2 and the date of decedent's death? Why was not the scrivener of the will called to inform the court who gave him instructions as to its contents? At whose suggestion was it prepared? So many circumstances connected with it not only place the will under grave suspicion, but substantially challenge the authenticity of the mark that was placed at the bottom. Appellees do not attempt to explain why they did not call the scrivener, who has since been displaced as counsel for Mrs. McAlarney. On the day of the funeral the will appeared in Attorney Brennan's hands. It was probated by him and letters were issued to Mrs. McAlarney. There was an offer of proof that she then went with him to the bank and withdrew from the decedent's savings account the sum of $7,000, all or a large part of which she immediately turned over to the attorney. As he had drawn the will, this fact alone carries more implications than it is necessary to recite.

The court below refused to admit evidence which had a vital bearing on the case. The bank slips excluded should have been admitted with the slip of June 21. The judge should have permitted a wide inquiry into the circumstances surrounding the execution of the will. He should, himself, have summoned the attorney who drew it, made him testify as to who suggested its preparation, what part he played in it, and why he charged Mrs. McAlarney the sum he did. Considering the fact that there had been no change in the eyesight of decedent, or marked physical retrogression from June 21 to the time of his death, and that he was able to write legibly on the former date, his signature by mark to a will that devises his entire estate to a stranger would give rise to natural inquiry in the mind of judge and layman alike. There was a substantial dispute as to its genuineness which should have been submitted to a jury.

Under Section 21 (b), of the Act of June 7, 1917, P. L. 363, the orphans' court must direct a precept for an issue *devisavit vel non* to the court of common pleas at the request of either party, whenever there is a substantial dispute upon a matter of fact. The test of what is a substantial controversy, the existence of which entitles a disputant to a jury trial as a matter of right, has been frequently pronounced by this court. Briefly stated, "to sustain the grant of an issue, the evidence must be such as would permit a verdict for either party to stand": *Hile's Estate*, 310 Pa. 541. As Mr. Justice STERN, in *Estate of Angelo de Laurentiis*, 323 Pa. 70, has recently reviewed the pertinent authorities, it is unnecessary to repeat them here. In that case it was said: ". . . it [is to] be borne in mind that the judge of the orphans' court conducting the hearing is not to constitute himself the jury, that is, to decide the case as he would if acting in the capacity of an ultimate fact-finding tribunal. His function is to decide whether there is a substantial dispute upon a material matter of fact, and such a dispute exists if a verdict that might be reached by a jury, even if at variance with his own opinion, would not have to be set aside as judicially untenable because contrary to the weight of the evidence." The court below found that no such substantial dispute was presented. This was clearly error, for a verdict for either appellant or appellee upon this record would not be set aside.

An issue upon the disputed authenticity of this will must be framed and certified to the court of common pleas for jury trial. When it is, the court should be liberal in the admission of evidence to establish the true state of affairs, for it is apparent that the decedent lived on the friendliest terms with his nephews and nieces. As he was not a married man, it requires some explanation to show why he gave all of his estate to his landlady, who was paid for her services, and denied his nearest relatives everything.

Decree reversed with a procedendo.