Zakatoff Will.

Argued March 28, 1951. Before DREW, C. J., STERN, JONES, BELL, LADNER and CHIDSEY, JJ.

re-argument refused June 27, 1951.

*R. J. Lucksha,* with him *Charles Recht,* for appellant.

*James P. McArdle,* with him *Paul J. McArdle,* for appellee.

OPINION BY MR. JUSTICE BELL, May 23, 1951:

This is an appeal from the decree of the Orphans' Court of Allegheny County refusing an issue devisavit

vel non and dismissing an appeal from the decree of the Register of Wills, which admitted to probate the last will of George V. Zakatoff, dated *December 29, 1945*. Zakatoff, who came to America in 1912, died in Pittsburgh on September 17, 1946. Appellant, an alien non-resident Russian who alleges he is decedent's brother, contends that the aforesaid will was a forgery and that an issue should be granted thereon. His argument is based almost entirely on the fact that the will was signed by a mark, plus inferences and conclusions from inconsequential testimony which he alleges casts doubts and suspicion upon the validity of the will. His petition for an issue was joined in by an escheator appointed by the Commonwealth of Pennsylvania, though their ultimate interests were conflicting and irreconcilable.

Zakatoff, in his very short will, authorized his executor to look after his burial; left $250.00 to his friend Ben Gover; $100.00 to his friend Paul Zenchenko; $100.00 for a Russian Language School in the United States; and "5. The balance of my estate remaining, I leave entirely to my friend George E. Park. I trust and believe in Mr. Park's ability to *help my close relations* as much as possible *if they are still living in Novozibkow in Russia*".* Zakatoff appointed George E. Park to be executor; and then made his mark at the end of the will.

It may not be amiss to note at this point that contestant proved by his three strongest witnesses that Zakatoff told them he believed his father, mother, sister and brother were all dead and that he had no living relatives. Instead of aiding contestant's case, this testimony seems to us to give plausible explanation and ample justification for the omission of any specific bequest to Zakatoff's brother and for the tes-

---

* Italics throughout, ours.

tamentary gift of the residuary estate to Park, trusting in his ability to help testator's close relations if they are still living in Novozibkow.

The circumstances surrounding the execution of the will may be briefly summarized as follows: Zakatoff, James G. Hilvick, George E. Park, and a friend of Mr. Park, Mrs. Elvira Sack, met in Thompson's Restaurant on Fourth Avenue, in Pittsburgh, about 10:00 a.m. on December 29, 1945. This was a well known meeting place for Russian speaking people. Hilvick was a student of the Russian language and came there that morning at the invitation of Zakatoff and Park and Mrs. Sack came there at Park's request, to witness a will. Zakatoff took from his inside coat pocket a writing which he asserted to be his will and requested Hilvick and Mrs. Sack to act as subscribing witnesses. The handwriting was in the *Russian language*. Zakatoff signed the paper in the presence of Hilvick and Mrs. Sack. Hilvick witnessed it but Mrs. Sack refused to witness it because she did not understand the Russian language and would not sign anything she did not understand. Her refusal seems to us both plausible and wise. Because of Mrs. Sack's unwillingness to witness the Russian will, Hilvick was asked by Zakatoff to translate the writing into English (which he laboriously did) and to write it on another piece of paper.

The testator said that because of the different names by which he was known, or the different ways in which his name was spelled, he thought it best to execute this will by a mark in order to avoid trouble. He therefore requested Hilvick to write his, the testator's, name and he would add his mark because of his lack of learning. Hilvick thereupon added an explanatory paragraph to the will as follows: "I want to add, that unfortunately due to my lack of learning, although I

know some letters of the alphabet, it would be better if I signed my name to this will by making a cross, or my mark". Hilvick, at Zakatoff's request, wrote Zakatoff's name and Zakatoff then made his mark and the document was then witnessed by James G. Hilvick and Elvira Sack, both of whom saw Zakatoff sign and make his mark in their presence:

"December 29th, 1945

His

My Signature: George V. X Zakatoff

mark

Witness: James G. Hilvick

Witness: Elvira Sack"

The testimony of the subscribing witnesses with respect to the will was clear, positive, convincing and unshaken;[*] and, equally important, their story of the execution of the will and of the attendant circumstances was believed by the (hearing judge sitting as a) chancellor who saw and heard them. From a reading of the record we agree with the chancellor that their story was credible, plausible and convincing. The chancellor's decree was affirmed by the court in banc; from that decree this appeal was taken, not by the escheator, but solely by the brother in Russia.

Contestant attaches great importance to the fact that Zakatoff could sign his own name and when he made a mark instead of signing his name to the will, contestant insists that that action demonstrated that the will must have been fraudulent and forged. The execution of a will by a mark by a testator who is able to write his name is prima facie suspicious, although suspicion and conjecture cannot take the place of proof nor are they singly or together sufficient to prove fraud or forgery: *Ash. Will*, 351 Pa. 317, 324, 41 A. 2d

---

[*] There was a difference of recollection as to whether Thompson's Restaurant was on Fourth Avenue or Smithfield Avenue.

620; *Rosenthal's Estate*, 339 Pa. 488, 496, 15 A. 2d 370.

Three pertinent questions arise: (1) was, the testator able to write his name; (2) if so, why did he execute his will by making a mark instead of by writing his name; and (3) is the will, executed under the facts and circumstances of this case, valid? We shall answer these questions in considering the evidence produced by contestant.

Contestant produced evidence of decedent's signature card in several Pittsburgh banks. They were all signed in *Russian* script and orthography, but endorsed on the account card and on its books by the Foreign Department of each bank was an English version of the name. The chancellor found "Attempted reproduction of the signature in English type would be 'Teoperiu B. Zakamobr', there being an accent mark over the 'u'. The various English versions are 'Georgy V. Zakatoff', 'George V. Zakatoff', 'Georchi W. Zakatoff' and 'Georgey Zakatow' . . . Withdrawal slips in evidence contain *the Russian signature* in all instances except one showing 'George V. Zakatoff'. The signatures indicate generally rather shaky handwriting and there is testimony that when signing *testator would slowly write the letters as though drawing a memorized picture.* On the naturalization certificate, dated January 11, 1946, his signature at one place is 'George *Wasil* Zakatoff'. . . . and at another is 'George. *Wasel.* Zakatoff' . . ." Another of contestant's witnesses, Mrs. Miller, said *she did not think Zakatoff wrote in English,* and she first identified him as Sakatoff.

We believe that this evidence on the part of contestant proves not only that the testator could sign his name, but likewise adds *plausibility to the proponent's testimony that the testator wished to sign by a mark* since the spelling of his name was susceptible of several versions in English and the mark would avoid trouble.

We may add parenthetically that the chancellor further found that ". . . Mr. Zakatoff placed the document in his pocket [after execution] as he had done with the will in Russian. There is no testimony to indicate what happened to the latter", though we believe it likely, as did the court below, that Zakatoff intended the English will to supplant the Russian will and to be his sole will. Whether the Russian will was destroyed by the testator or what became of it no one knows. All we know is that the Russian will was never found. We do not see how this helps contestant's case.

*A will executed by a mark in accordance with the statute* and subscribed to by two or more competent witnesses *is undoubtedly valid if the testator is unable to sign his name for any reason* (other than the extremity of his last sickness), such as physical weakness or lack of education, or for any psychological or emotional reason; and *the sufficiency of the reason for not signing his name is for the testator's determination and not for the determination of the court: Rosato's Estate,* 322 Pa. 229, 185 A. 197; Wills Act of June 7, 1917, P. L. 403, §§2 and 3, 20 P. S. §§191 and 192. *Rosato's Estate,* clearly rules the present case. In that case the testator's *signature by mark was sustained as valid where he was able to write but stated he was too nervous.* The facts in favor of the contestant's case were far, far stronger in *Rosato's Estate* than in the present case. The Court in its opinion said (pages 230, 231): " 'Every will shall be in writing, and, unless the person making the same shall be prevented by the extremity of his last sickness, shall be signed by him at the end thereof, or by some person in his presence and by his express direction. . . . If the testator be unable to sign his name, *for any reason* other than the extremity of his last sickness, *a will to which his name is subscribed in his presence,* by his direction and authority *and to which he makes his mark or cross,* unless unable to do so,—in

which case the mark or cross shall not be required,—shall be as valid as though he had signed his name thereto.' (Both sections require proof by two witnesses.)

"Thus we have the requirement of signing by the testator himself, unless prevented by the extremity of last sickness, and in that event by some person in his presence and by his express direction; or if unable to sign his name *for any reason other than* the extremity of his last sickness, his name may be subscribed by another in the testator's presence, by his direction and authority and he shall make his mark or cross if able to do so, if not, it is not required. So the legalities of execution are (1) signing by the testator unless last sickness prevents, if so, then by another by direction; (2) if unable to sign for any reason other than last sickness, then by another by direction *accompanied by testator's mark* if not unable to make it. As we view the act *the sufficiency of the reason for not signing his name is for the testator's determination;* 'any' reason which moves him not to sign is sufficient provided there is compliance with the other requisites of the act."

Contestant, grasping at any straw, contends that the subscribing witnesses were interested witnesses and because of this and their moral character were unworthy of belief. Contestant forgets that his two principal witnesses were even more interested witnesses and less entitled to be believed. The subscribing witness Hilvick was the son of a woman with whom Park had been living, but they were not living together at the time of the trial *nor had they been living together since* sometime *prior to* the execution of this will in 1945. Park had once advised Mrs. Sack about a divorce. On the other hand, contestant's two principal witnesses were (1) Mrs. Cieslak, a mortician, and (2) an attorney who had been disbarred for a year and who got possession of a considerable number of testator's assets a few days after his death in *September 1946,* and never notified the executor of

these assets until his possession thereof was brought out in the trial of this case in 1950. Moreover, he was *the informer* in this case and of course expected to receive an informer's fee of 25% of the estate. Mrs. Cieslak, a mortician who charged $990. (in an estate of $15,000.) for funeral expenses, went with another friend to decedent's room the day after he died and removed his body, clothing, and such assets as she could find, over the protest of his landlady, Mrs. Miller. These assets she turned over to the aforesaid informer, who was her attorney. Her justification for removal of decedent's assets was (a) that she went to decedent's home with a friend of the decedent to find his will; and (b) that the decedent had told her he wished her to bury him and to spend $1000. on his casket. She sought to discredit Park, the residuary legatee (and thus to indicate that the will must have been a forgery) by testimony that on one occasion the decedent made very derogatory remarks about Park. It is significant that none of the 14 other persons who were present when these alleged remarks were made were called as witnesses to corroborate Mrs. Cieslak's story. A reading of her testimony, which at times was evasive and unbelievable, does not buttress contestant's case.

Park was offered as a witness to prove the execution of the will and the circumstances incident thereto, as well as his relations with the testator and other pertinent matters. Counsel for contestant objected strenuously to Park's testimony and his objection was sustained. Park was a competent witness and he should have been allowed to testify: *Dalbey's Estate,* 326 Pa. 285, 192 A. 129; *Frew v. Clarke,* 80 Pa. 170; but in view of contestant's objection to his testimony, we cannot understand or appreciate contestant's present complaint about Park's failure to testify.

Another point which contestant claims indicates suspicious circumstances and fraud is that Ben Gover,

to whom a legacy of $250.00 had been left, had died approximately a year and a half before the will was made. There was not a scintilla of evidence that Gover's death was known to Zakatoff; and it is at least as plausible to argue that a forger would not make a bequest to a dead man as to argue that a bequest to a dead man proved fraud and forgery.

Contestant makes much of alleged declarations by testator to Mrs. Cieslak and to the informer that he had not made a will; but he objects strenuously to the countervailing testimony of proponent that Zakatoff had made a will. Mrs. Cieslak and the informer testified that Zakatoff told them about a month before December 29, 1945 that he did not have a will. If such testimony is important and credible, it seems to us that it helps instead of damages proponent's case, because a month thereafter Zakatoff signed the present will. The informer also testified that Zakatoff made a similar statement to him ten days before his death.

Perhaps the strongest evidence produced by contestant is the testimony of Mrs. Miller that Zakatoff, who was her tenant, never went out for any length of time and never went out on a Saturday. Contestant argues from this that Zakatoff could not have signed this will and it must have been a forgery. The testimony of Mrs. Miller, (aged 72, who all parties agree was an honest witness), does not, when read in its entirety, prove that Zakatoff could not have been away from her house on Saturday, *December 29, 1945*—nearly five years prior to the time she testified. She said she remembered the week after Christmas of 1945 because she was sick in bed with a bad cold and that Zakatoff, during that time, took care of her. When asked what she meant by his taking care of her, she answered "He took care of the furnace and gone to the store for me, that's all he had to do". Her bedroom was in the back of the house; Zakatoff's bedroom was in the front of

the house; *she saw Zakatoff at breakfast-time,* which was before 8 o'clock in the morning, *and the next time she saw him was around dinner-time when he got her her food;* but she is sure that Zakatoff wouldn't have left the house unless he told her. She repeated several times that there was nothing about that particular Saturday to stand out in her memory; and she based her answer as to Zakatoff's being home on that Saturday by what were his usual habits and customs. A reading of her testimony will demonstrate that it utterly fails to prove her conclusion that Zakatoff never left her house that day.

The chancellor and the court in banc found the subscribing witnesses were credible and that the testator executed the will by a mark under the circumstances clearly and positively testified to by them. The chancellor's refusal of an issue devisavit vel non will not be reversed by an appellate court unless there was an abuse of discretion: *DeLaurentiis's Estate,* 323 Pa. 70, 78, 186 A. 359; *Dible's Estate,* 316 Pa. 553, 554, 175 A. 538; *Lare Will,* 352 Pa. 323, 330, 42 A. 2d 801. Not only was there no abuse of discretion by the chancellor, but the facts and circumstances adduced by contestant were so flimsy and inconsequential that it would have been a gross miscarriage of justice to hold that contestant's evidence raised a substantial or material dispute of fact, which is requisite for the granting of an issue: *Higbee Will,* 365 Pa. 381, 75 A. 2d 599; *Sturgeon Will,* 357 Pa. 75, 53 A. 2d 139; *DeLaurentiis's Estate,* 323 Pa. 70, 186 A. 359; *Lare Will,* 352 Pa. 323, 42 A. 2d 801; *Ross Will,* 355 Pa. 112, 49 A. 2d 392.

Decree affirmed at cost of appellant.