Hall Will.

Argued November 18, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and MCBRIDE, JJ. Decree affirmed December 31, 1959. Reargument ordered February 2, 1960. Reargued May 3, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*I. Reines Skier*, with him *Robert T. Weinger*, for appellants.

*James Rutherford*, with him *J. Wilson Ames, A. Emerson Howell, John J. Koehler*, and *Louis B. Nielsen*, for appellees.

OPINION BY MR. CHIEF JUSTICE JONES, January 4, 1961:

The question raised on these appeals is whether the court below erred in refusing to award an issue

*devisavit vel non* with respect, primarily, to the testamentary capacity of the decedent at the time she executed her alleged will on June 20, 1955. The answer depends upon whether a substantial dispute exists, under the evidence adduced at the hearing before the chancellor, with respect to the decedent's testamentary capacity at the critical time.

The long established rule as to when a party in interest has a right to a jury trial of an issue of fact concerning the validity of a testamentary writing is now embodied in §745(a) of the Act of August 10, 1951, P. L. 1163, as amended, 20 PS §2080.745(a), as follows: "When a substantial dispute of fact shall arise concerning the validity of a writing alleged to be testamentary, any party in interest shall be entitled to a trial of this fact by a jury . . . ." It devolves upon us, therefore, to review all the evidence of record, both oral and documentary, and determine whether or not a substantial dispute of fact does exist as to the decedent's mental capacity understandingly to execute a will at the time she signed the testamentary writing in controversy.

The testimony at the hearing in the court below very definitely discloses that in 1953, Mrs. Hall, the decedent, then being upwards of eighty years old, began to fail mentally to a very noticeable degree; that her mental deterioration was apparently hastened by the death of her husband in 1954; and that her impaired mentality worsened until, in the spring of 1955, it was such as to alarm her friends and neighbors. A number of them testified that by that time Mrs. Hall was in an advanced stage of senility. They related relevant and pertinent facts and circumstances concerning Mrs. Hall's changed appearance, conduct and condition in support of their assertions as to her evident mental debility. It was during this period, viz., April of 1955, that one Elton Gillow, of the village of

Equinunk, Wayne County, where Mrs. Hall also resided, called L. B. Nielsen, an attorney at Honesdale, some 20 miles distant, and asked him to come to Gillow's home for the purpose of drafting a will for Mrs. Hall, who, up to that time, had been wholly unknown to attorney Nielsen. Mrs. Hall had been acquainted with Gillow for a long time. In fact, he had been a mail carrier at the post office of which she, at an earlier period, had been postmistress for about twenty years; also her late husband was a half-brother of Gillow's wife.

Pursuant to Gillow's request, Mr. Nielsen met Mrs. Hall at Gillow's home in April, 1955, and obtained from her a list of names of certain persons with addresses and amounts pertaining to suggested bequests to be made. Gillow was to be named executor of her will. Mr. Nielsen was unable, however, at that time to secure from Mrs. Hall the information which he deemed necessary for a bequest to Gillow and for the disposition of a certain farm which she owned. Nor did he then secure from her any information concerning the size of her estate or the disposition which she might wish to make of the residue. Mr. Nielsen departed without having drafted a will for Mrs. Hall's signature and did not see her again until two months later after she had become a patient (during what proved to be her last illness) at the Wayne County Memorial Hospital in Honesdale, to which she was admitted on June 4, 1955.

According to the testimony of Mrs. Hall's physician, Dr. Howard R. Patton, at the time she was admitted to the hospital she was "a critically ill patient," suffering from cerebral arteriosclerosis and manifesting increasingly baleful symptoms of senility. Shortly after her admission to the hospital, Mr. Nielsen told persons in contact with Mrs. Hall at the hospital of the uncompleted will and asked that he be notified

when, as and if, she improved sufficiently to see him. A couple of days later, Nielsen was twice informed that Mrs. Hall was improved but, on each occasion, when he arrived at the hospital shortly thereafter, he found her unable to converse with him intelligently. His candid testimony, as a witness for the proponents, goes far to confirm that, in truth, a very disputable issue, as to whether Mrs. Hall was mentally capable of making a will at any time while she was in the hospital, exists. Concerning his two above-mentioned visits to the hospital to see her, as a result of having been summoned, Mr. Nielsen testified, "[Dr. Patton] told me from his examination that morning, if I would come up, she would be able to talk these matters over with me, and I went up about two hours later and Mrs. Hall, I believe, was in the ward in an oxygen tent, and I brought a copy of this paper along with me, and I said, 'Mrs. Hall, do you remember me?' and she was in a very weakened condition and I couldn't tell whether she did recognize me or not. I talked to her for a few minutes and I could see her mind was rambling and she was not in any condition to discuss legal matters at all—it had been an hour or an hour and a half between the time I was called and the time I got up there—and I told the nurse if she thought the next day she was better, or the next time she felt she was better, to have me come up. So I went up the next day and I found her in the same condition and I left." Commendably enough, nothing was done by Mr. Nielsen, as a result of those visits, looking to the preparation of a will for Mrs. Hall.

The next time Mr. Nielsen saw Mrs. Hall was on June 17th when he went to the hospital as a result of having been contacted, "around the 15th" by Mr. Gillow and Mr. Pethick, the superintendent of the hospital, who was concerned that the nurses' bills had not been paid and that the hospital had not been paid.

When Mr. Nielsen had first been told about this, "around the 15th", he had said, "I don't see if she is not in better condition than when I saw her what can be done about it, but I will inquire what the situation is." He got in touch with a bank where Mrs. Hall had an account and "suggested that they send down a check . . . and if Mrs. Hall became lucid that the check could be presented to her and explained to her that these bills had to be paid, but that did not work out." Then it was that on June 17th he was called up from the hospital and told that Mrs. Hall was mentally alert and that they felt he could discuss the matter of the nurses and the hospital bills with her. Continuing, Mr. Nielsen testified, "When I talked to her, I felt she knew me, she recognized me, she remembered I was up at Equinunk that night and I told her there was a problem here about the nurses. I said, 'Miss Lorenz and the other nurses have not been paid and' that 'these girls must be paid as soon as possible,' and if she wanted me to that I could [prepare] a power of attorney, which would be limited to purely the matter of paying . . . her medical bills and hospital bills, and, after I explained that to her and she said that was what she wanted, I then went down to my office and prepared it and brought it up." Mrs. Hall signed it in the presence of two nurses, who witnessed it, and a local justice of the peace took her acknowledgment of it. Why Mr. Nielsen did not then also bring to Mrs. Hall's attention the matter of her uncompleted will does not affirmatively appear. But, there is ample evidence to support a strong inference why nothing whatever was said about a will at that time. On the very same day (June 17th), Mr. Nielsen, accompanied by Mr. Gillow, went to the home of an aged cousin of Mrs. Hall, living at Honesdale, where he informed the cousin that he had been trying unsuccessfully to complete a will for Mrs. Hall and stated that in her present condition she

was obviously incompetent to make a will. He asked
the cousin to stand by for news of Mrs. Hall's death
and, then, to come to his office for the purpose of hav-
ing an administrator of Mrs. Hall's estate appointed.

On the morning of June 20th, in response to a call,
Mr. Nielsen went to the hospital and talked to Mrs.
Hall about her will. This, it will be noted, was the
first time he had attempted to do so since her admis-
sion to the hospital on June 4th. As already pointed
out, on two of his prior visits for the purpose of dis-
cussing a will with her, he had avowedly found Mrs.
Hall incompetent to consider a will and, on his third
visit, the subject of a will, significantly, had not even
been mentioned. However, on June 20th, Mr. Nielsen,
after talking to Mrs. Hall, returned to his office and
there drafted a will which he caused to be typed and
which he took, a little later, to the hospital and handed
to Mrs. Hall's nurse, Miss Helen Lorenz. He asked
Miss Lorenz to read the will to Mrs. Hall, which Miss
Lorenz testified she did while Mr. Nielsen and Mr.
Pethick, the hospital superintendent, awaited in the
hallway outside of the door to Mrs. Hall's room. After
the nurse had finished reading the will, Mrs. Hall
signed it and Miss Lorenz and Mr. Pethick signed it
as subscribing witnesses. This was between 11:30 and
11:40 a.m. on June 20th. After some specific bequests,
the will left the residue of approximately $50,000,
roundly 70% of the decedent's estate, in equal shares,
to the Equinunk Methodist Church (of which Mrs. Hall
was not a member and which she did not attend) and
the Wayne County Memorial Hospital (an institution
to which she had theretofore steadfastly refused to con-
tribute).

After the will had been executed, Mr. Nielsen
placed it in the safe in Mr. Pethick's office in the hos-
pital. Shortly thereafter, Mr. Nielsen went back to the
hospital, took the will from the safe and, without see-

ing Mrs. Hall again or conferring with her in any way, carried the will back to his office where he caused a codicil to be typed on the back of it. He then returned to the hospital, about 1:15 p.m., and gave the will, bearing the added codicil, to Mr. Pethick for Mrs. Hall's execution of the codicil, instructing Mr. Pethick at the time to "explain to Mrs. Hall why she should sign the codicil." There is no evidence that anyone ever explained to Mrs. Hall why she should sign the codicil or made known to her its purposes and possible effect. Mrs. Hall signed the codicil at the request of her nurse, Miss Lorenz, who, with the supervising nurse, Mrs. Henrietta L. Young, signed as subscribing witnesses to the codicil. Miss Lorenz testified that she could not remember who brought the codicil to Mrs. Hall's room; nor could she remember what time this occurred, although, as she recalled, it was not long after the will had been signed. Mrs. Young, the other subscribing witness to the codicil, was on vacation at the time of the hearing in the court below and, consequently, was not called to testify.

The codicil provided that, in the event of Mrs. Hall's death within thirty days, the bequest to the Equinunk Methodist Church and the Wayne County Memorial Hospital should be paid "to Louis B. Nielsen, Jr., & W. D. Pethick, whom I believe will carry out my wishes." This dispositive provision of the codicil never became effective. Mrs. Hall died on July 28, 1955, more than thirty days after the will had been executed.

Testamentary capacity is to be determined by a testator's mental condition at the time current with the execution of the will: *Skrtic Will,* 379 Pa. 95, 100, 108 A. 2d 750; *Williams v. McCarroll,* 374 Pa. 281, 293, 97 A. 2d 14; *Lewis Will,* 364 Pa. 225, 231, 72 A. 2d 80; *Dichter Will,* 354 Pa. 444, 448-449, 47 A. 2d 691. What constitutes testamentary capacity was well defined in *Lewis Will,* supra, at p. 232, as follows: "A decedent

possesses testamentary capacity only if he has a full and intelligent knowledge of the act in which he is engaged and of the property he possesses, together with an intelligent perception and understanding of the disposition he wishes to make of his property and of the persons and objects he desires to participate in his bounty [citing cases]."

In view of the unrefuted testimony concerning the progressive and patently evident mental incompetence of the senile testatrix in the instant case, it seems not only clear but beyond dispute that, for some time prior to the making of the disputed will, Mrs. Hall was mentally incapable of transacting business. Witness the necessity of having her execute a power of attorney on June 17th in order that her overdue bills for nurses and hospital could be paid. In *Cressman Estate*, 346 Pa. 400, 404, 31 A. 2d 109, Mr. Chief Justice MAXEY declared for a unanimous court that "The Court below correctly held: 'Where a will was properly executed in every particular, a presumption of testamentary capacity and lack of undue influence arises, compelling evidence to upset the will, since the law favors its validity, *unless it appears that the testator for some time prior to its execution has been mentally incapable of transacting business, in which event the burden of proof is on the proponent of the contested will.*' " (Emphasis supplied.)

The proponents, in an effort to meet the burden of establishing that Mrs. Hall possessed testamentary capacity at the time of the preparation and execution of her will on June 20, 1955, offered the testimony of Mr. Nielsen, the scrivener, Dr. Patton, the decedent's attending physician, and Miss Lorenz, her nurse. Nielsen testified that, when he talked to her about her will on the morning of June 20, 1955, she realized the import of what she was doing, the extent and nature of her estate, was aware of the identity of her relatives,

and discussed the matter of her will with him intelligently. Miss Lorenz testified that, at a time shortly before Mr. Nielsen arrived at the hospital on the morning of June 20, 1955, Mrs. Hall's "breathing was much better, and that was the first time she had been alert since being in the hospital at any time, and her color was much improved . . . ." She also stated that, after she had read the will to Mrs. Hall, the latter "seemed satisfied; she understood and she was very alert." But, Miss Lorenz immediately qualified this statement by adding the plainly comparative observation. "I mean, that is the most alert I have ever seen her." She had seen the patient only since she had been admitted to the hospital two weeks earlier in an advanced stage of senility.

Dr. Patton was not present when Mr. Nielsen discussed the will with Mrs. Hall, nor was he or Mr. Nielsen present when the will was read to her and signed by her. He testified that he had examined Mrs. Hall about 9:30 or 10 a.m. on June 20th and that, later in the day at the request of Mr. Nielsen, he had made the following entry in Mrs. Hall's hospital chart. "Have today found Mrs. Hall to be clear and lucid in her thought and content of her thoughts. She is aware of her location in the hospital and her status as a patient in the hospital. She at this time is perfectly capable of making her last Will and Testament." Dr. Patton admitted that this was the only time in his approximately 20 years of active practice that he had ever made such an entry in a hospital chart. He also re-examined Mrs. Hall early in the afternoon of June 20th, again at the request of Mr. Nielsen, and testified that, "Her condition at the time of the second examination seemed to be just the same as when I saw her previously. I am talking about her mental condition." Dr. Patton added that Mrs. Hall realized who she was, that she was in the hospital and understood the import of her acts of that

day. On cross-examination, the doctor, reading from the hospital notes prepared by the attending nurses of Mrs. Hall for June 20, 1955, confirmed that from 1 to 4 a.m. her pulse was 104 (60 to 90 being normal) and was of poor quality and that she was complaining of severe pain in the right lower kidney region; that at 7:30 a.m. her lips and finger tips were cyanotic (blue) and that she vomited and her breathing was labored; that at 8 a.m. the nurse had been unable to arouse her, her face and arms were very flushed and she was placed in an oxygen tent; that, at 9:30 a.m. she had difficulty in swallowing; and that at 10 a.m. she was "turned from side to side" and was "very alert at present; asked for bed pan and knows that she is in the Wayne Memorial Hospital." That her "alertness" was merely relative in her extreme senile condition is all too evident.

Considering the testimony of the witnesses as a whole, and in view of the fact that the burden of affirmatively establishing testamentary capacity is, under the evidence in this case, on the proponents of the will, it is not possible for a chancellor to say, *as a matter of law,* that Mrs. Hall, at the time she signed her will, possessed a full and intelligent knowledge and understanding of the property she possessed and a rational conception of the disposition she wished to make of it by will or of the persons and objects she desired to share in her testamentary bounty. A jury's verdict against the will could not justly be set aside by the court. There is present, therefore, in this case a substantial dispute of fact concerning Mrs. Hall's testamentary capacity on June 20, 1955, which should have impelled the award of an issue *devisavit vel non* and the chancellor's failure so to do is reversible error.

The appellants' remaining assignment of error, relative to asserted undue influence, is not supported by

evidence sufficient of itself to raise a substantial dispute of fact concerning the validity of the alleged will.

The decree is reversed, at the estate's costs, and the record remanded for trial by jury of the issue of fact whether or not at the time of the decedent's execution of her purported will on June 20, 1955, she was a person of sound mind and possessed of testamentary capacity.

---

DISSENTING OPINION BY MR. JUSTICE BENJAMIN R. JONES:

I dissent from the action of a majority of this Court in reversing the decree of the chancellor in the court below and awarding an issue d.v.n. on the question of testamentary capacity. In my opinion, the majority of this Court in reaching this result ignore precedents long recognized in this area of the law, substitute their findings of facts for the findings of the chancellor who had the opportunity of hearing and observing the witnesses and introduce a novel theory as to the burden of proof as to testamentary capacity in will contests.

The issue is narrow: does the evidence present a dispute of fact as to testatrix' testamentary capacity on the date of the execution of the will so substantial in nature as to require, under the statute,[1] its admission to a jury for its determination?

In reviewing the refusal of an issue d.v.n. we seek to ascertain *only* whether the chancellor has abused his discretion: *Masciantonio Will,* 392 Pa. 362, 367, 141 A. 2d 362; *Farmer Will,* 385 Pa. 486, 487, 123 A. 2d 630; *Williams v. McCarroll,* 374 Pa. 281, 299, 97 A. 2d 14; *Zakatoff Will,* 367 Pa. 542, 552, 81 A. 2d 430. Upon appellate review, the findings of the chancellor,

---

[1] Section 745(a), Act of August 10, 1951, P. L. 1163, Art. VII, as amended, 20 PS §2080.745(a).

unless without evidential support or unless the evidence has been capriciously disbelieved by the chancellor, are entitled to the weight of a jury's verdict and are controlling: *Masciantonio Will,* supra, 367, and authorities therein cited.

It is the chancellor's function, in the first instance, to determine the substantiality of the dispute of fact. The chancellor in the court below had to resolve this question: if this factual issue were submitted to a jury and the jury returned a verdict against the will, would such verdict have to be set aside as contrary to the weight of the evidence? If the answer was "no", the dispute would be substantial; if the answer was "yes", the dispute would not be substantial: *Lewis Will,* 364 Pa. 225, 233, 72 A. 2d 80; *Lare Will,* 352 Pa. 323, 42 A. 2d 801; *DeLaurentiis's Estate* 323 Pa. 70, 79, 186 A. 359; *Kline's Estate,* 322 Pa. 374, 378, 186 A. 364.[2] On appellate review, we pass only upon the exercise of the chancellor's discretion in his assessment of the weight of the credible evidence and *only* if the chancellor has abused such discretion do we reverse his action.

The basic error in the majority's position is that it erroneously places the burden of proof upon the proponent in the instant factual situation and then concludes that proponent has failed to sustain this burden. In my opinion, the manner in which the majority opinion places the burden of proof upon the proponent introduces a new doctrine into this field of the law.

---

[2] It should be noted that the 1956 amendment to the Orphans' Court Act of 1951, supra,—in effect at the time of this hearing—provides that if the court is *not* satisfied with the justness of a jury verdict on the basis of all the evidence, the court may "set aside the verdict, grant a new trial or enter such other judgment as satisfies its conscience".

A citizen has no right of greater value than the right to dispose by will of his or her property and the last final direction of a testator or testatrix should not be set aside except for the clearest and most compelling reason: *Mohler's Estate,* 343 Pa. 299, 308, 22 A. 2d 680; *Wetzel v. Edwards,* 340 Pa. 121, 128, 16 A. 2d 441. In line with that conception, we have said: "Testamentary capacity is presumed. After proof of execution by two witnesses the burden of proof as to incapacity is on contestant: [citing cases]." *Sturgeon Will,* 357 Pa. 75, 81, 82, 53 A. 2d 139. Furthermore, we have said that when the proponent offers in evidence the record of probate of the will, a prima facie case of the validity of that will is established and the burden is then upon the contestants to come forward with evidence of testamentary incapacity: *Simon Will,* 381 Pa. 284, 292, 293, 113 A. 2d 266; *Ash Will,* 351 Pa. 317, 321, 323, 41 A. 2d 620; *Szmahl's Estate,* 335 Pa. 89, 90-94, 6 A. 2d 267; *Plotts' Estate,* 335 Pa. 81, 87, 88, 5 A. 2d 901; *Keen's Estate,* 299 Pa. 430, 440, 149 A. 737.

We have before us a will, normal in every respect, the execution of which by the testatrix is not disputed. The proponent offered and the chancellor received into evidence the record of the probate of the will. Under our case law, a presumption then arose that at the date of execution of this will the testatrix possessed testamentary capacity and the contestants had the burden of coming forward with evidence that the testatrix did not have such testamentary capacity.

To ascertain the extent to which the contestants carried their burden the record must be examined. Contestants sought to prove lack of testamentary capacity on testatrix' part beginning in the early part of 1955[3]

---

[3] Although one of contestants' witnesses placed the onset of this incapacity as far back as 1953, contestants' counsel conceded that in 1954 the testatrix did not lack testamentary capacity.

and extending until the time of testatrix' death in July 1955. Contestants' testimony depicted testatrix in the pre-hospitalization period—March 1955 to June 5, 1955 —as a woman of advanced years, untidy in her personal habits and the care of her home, occasionally suffering lapses of memory and inability to recognize friends and unable to adequately transact ordinary business affairs. From the time of testatrix' admission to the hospital on June 4, 1955 to the date of her death —July 28, 1955—testatrix suffered from general arteriosclerosis and was a very ill woman. Contestants' testimony in this respect may be summarized: one witness who made two visits to the hospital observed testatrix in an oxygen tent and testatrix could not recognize this witness; another witness who visited the hospital on three occasions found testatrix rambling about her husband, mother and brother long deceased and unable to recognize the witness; another witness who made five visits—June 6, 10, 17, 25 and July 14—found testatrix in the same general condition; another witness who visited testatrix on June 8 found her rambling, incoherent and unable to recognize people; two other witnesses, unable to fix the dates of their visits and another witness, who visited testatrix on June 11 and June 18 and on another specified date, found her in the same general condition.

An examination of the record indicates that taking contestants' testimony during testatrix' pre-hospitalization period in its most favorable light, all that contestants proved was that testatrix was a woman of advanced years, untidy in her habits, who suffered lapses of memory and was at times unable to recognize friends. In *Aggas v. Munnell et al.*, 302 Pa. 78, 85, 152 A. 840, we stated: "Neither old age, nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own prop-

erty." See also: *Ash Will*, supra; *Higbee Will*, 365 Pa. 381, 384, 75 A. 2d 599; *Conway Will*, 366 Pa. 641, 644, 645, 79 A. 2d 208; *King Will*, 369 Pa. 523, 528, 87 A. 2d 469; *Roberts Will*, 373 Pa. 7, 16, 17, 94 A. 2d 780; *Farmer Will*, 385 Pa. 486, 490, 491, 123 A. 2d 630; *Lawrence's Estate*, 286 Pa. 58, 132 A. 786. The contestants' evidence falls far short of proof of testamentary incapacity during the period prior to testatrix' hospitalization. At the same time, much of the testimony is flatly contradicted, even in contestants' own case and the chancellor below so found.[4]

Contestants' evidence, viewed in its most favorable light, would indicate that on various occasions while in the hospital the testatrix was unresponsive, incoherent, unable to recognize persons and generally unable to make a will. Such evidence, however, was of comparatively little weight in view of several important testamentary omissions. First, the contestants failed to prove that testatrix' illness was of such nature and character as to preclude the existence of any lucid intervals[5] and, second, the contestants failed to

---

[4] By way of illustration: Mrs. Adams, contestants' principal witness testified that as far back as December 1954 testatrix lacked testamentary capacity, yet in May 1955 this witness prepared and had the testatrix sign a paper purporting to make a cemetery bequest and stated that at that time testatrix knew what she was doing; the same witness testified that testatrix on March 14, 1955 was unable to take the minutes of the Water Company meeting yet the minutes themselves, in testatrix' handwriting, clearly show the contrary; this same witness testified that in May 1955 testatrix was unable to transact ordinary bank business yet on that same date the testatrix drew five checks to pay bills, which checks on their face are regular in every respect; Mrs. Bullock, another of contestants' witness, was the witness of a will drawn by the testatrix in the latter part of 1954 or the early part of January 1955 and the testatrix then knew what she was doing.

[5] Cf: *Dichter Will*, 354 Pa. 444, 47 A. 2d 691; *Moore's Estate*, 317 Pa. 42, 45, 176 A. 241. It is to be noted in this connection that

produce *any* evidence as to testatrix' mental capacity on the date the will was executed.

Prior decisions of this Court have held that, while evidence of a testator's testamentary capacity or incapacity for a reasonable time before or after the date of execution of a will may be admissible, it is the mental condition of a testatrix *at the time she executed the will* which is the important criterion: *Williams v. McCarroll*, 374 Pa. 281, 97 A. 2d 14; *Skrtic Will*, 379 Pa. 95, 108 A. 2d 750; *Aggas v. Munnell*, supra; *Higbee Will*, supra.

Moreover, no principle is more settled in this area of the law than that where the scrivener of a will, subscribing witnesses and the attending physician testify that the testatrix had testamentary capacity at the time she executed the will, *strong, clear and compelling testimony is necessary to overcome such evidence*: *Kane's Estate*, 206 Pa. 204, 55 A. 917; *Richmond's Estate*, 206 Pa. 219, 55 A. 970; *Leisey's Est.*, 280 Pa. 533, 124 A. 754; *Phillips's Est.*, 299 Pa. 415, 149 A. 719; *Aggas v. Munnell*, supra; *Brennan's Est.*, 312 Pa. 335, 168 A. 25; *Higbee Will*, supra, 382; *DeMaio Will*, 363 Pa. 559, 560, 70 A. 2d 339; *Franz Will*, 368 Pa. 618, 622, 84 A. 2d 292.

In the instant situation, the scrivener, the sole surviving witness and the attending physician all testified, without any contradiction, that on the date of execution of this will the testatrix possessed testamentary capacity. I have examined carefully contestants' evidence and I am of the opinion that it entirely lacks proof of the quality necessary to overcome the uncontradicted testimony as to the testamentary capacity of testatrix on the date of the will and that the chancellor

---

contestants' witness, Mrs. Bullock, on two occasions—the latter part of June or the early part of July prior to testatrix' death—visited testatrix and testatrix was then able to recognize her.

in the court below had no other recourse than to accept the testimony of what did happen on the date of the execution of the will rather than to hypothesize on what might have been her condition on that date as inferred from contestants' evidence.

In my opinion, the majority of this court ignores the presumption of this will's validity and the presumption that the testatrix possessed testamentary capacity, accords little or no weight to the testimony of the scrivener, the sole subscribing witness and the attending physician, and improperly evaluates the quality of contestants' evidence as compared with that of the proponent.

The rationale of the majority opinion is that, because there was evidence of progressive senility and incapacity on testatrix' part prior to the time this will was executed, the proponent therefore had the burden of proof of testamentary capacity. With this imposition of the burden of proof upon the proponent I am thoroughly in disagreement. Had Mrs. Hall been adjudicated by a court as mentally incompetent prior to the date of execution of this will, then, of course, the burden would have been upon the proponent: *Harden v. Hays,* 9 Pa. 151; *Titlow v. Titlow,* 54 Pa. 216; *Hoopes' Estate,* 174 Pa. 373, 34 A. 603; *Sterrett's Estate,* 300 Pa. 116, 121, 122, 150 A. 159; *Brennan's Estate,* supra; *Mohler's Estate,* supra.

In placing the burden of proof upon the proponent in this situation, the majority relies upon *Cressman Estate,* 346 Pa. 400, 404, 31 A. 2d 109, wherein this Court quoted with approval from the court below: "Where a will was properly executed in every particular, a presumption of testamentary capacity and lack of undue influence arises, compelling evidence to upset the will, since the law favors its validity, *unless it appears that the testator for some time prior to its execution has been mentally incapable of transacting busi-*

*ness, in which event the burden of proof is on the proponent of the contested will.* Landis v. Landis, 1 Grant 248; Wertheimer's Estate, 286 Pa. 155, Olshefski's Estate, 337 Pa. 420, 422." (Emphasis supplied.)

Reliance cannot be placed on *Cressman.* In the first place, *Cressman* incorrectly equates testamentary capacity and the capacity to transact business;[6] time and again we have stated that less capacity is needed to make a valid will than is sufficient in most cases to transact ordinary business: *Guarantee Co., etc. v. Waller,* 240 Pa. 575, 88 A. 13; *Kustus v. Hager et al.,* 269 Pa. 103, 112 A. 45; *Snyder's Estate,* 279 Pa. 63, 123 A. 663; *Novicki v. O'Mara,* 280 Pa. 411, 124 A. 672; *Lawrence's Estate,* supra; *Guarantee Trust, etc. v. Heidenreich et al.,* 290 Pa. 249, 138 A. 764; *Phillips's Estate,* supra; *Aggas v. Munnell,* supra; *Olshefski's Estate,* 337 Pa. 420, 11 A. 2d 487; *Higbee Will,* supra; *Conway Will,* supra. In the second place, *Cressman* is predicated upon three decisions which do not support the statement approved in *Cressman: Landis v. Landis,* 1 Grant 248; *Wertheimer's Estate,* 286 Pa. 155, 133 A. 144 and *Olshefski's Estate,* supra. In *Landis,* the trial judge, in charging the jury upon the issue d.v.n., stated (p. 250) : "When once such mental incapacity [not incapacity to transact business] is established, *and the . . . jury are convinced of that fact,* and a general derangement or imbecility of mind *clearly* proved, at any time prior to the time when the . . . will was executed, then the burden of proof is *changed,* and those who attempt to establish the validity of the paper, must prove that the alleged testator, at the time of the execution of the instrument, had sufficient

---

[6] That the majority opinion adopts such equation is clear: ". . . it seems not only clear but beyond dispute that, for some time prior to the making of the disputed will, Mrs. Hall was mentally incapable of *transacting business*". (Emphasis supplied.)

mental capacity to execute a will . . ." This Court found no error in such instruction. *Landis* only applies where mental incapacity has been established and found as a fact; absent such finding, *Landis* does not apply.[7] Furthermore and strangely enough, *Wertheimer* and *Olshefski* make absolutely no mention of the proposition approved in *Cressman;* on the contrary, in *Olshefski,* it was said: "The will was properly executed in every particular. In this situation, a presumption of testamentary capacity . . . arises, and the contestants must adduce compelling evidence to upset the will since the law favors its validity: [citing cases]." The statement from *Cressman,* which the majority opinion quotes with approval, is neither a correct statement of the law nor does it find support in any decision prior or subsequent thereto.

I see no useful purpose to be served by a recitation in detail of the testimony produced by contestants and proponent. Suffice it to say, that, in my opinion, contestants' proof is weak, contradictory and refuted and falls far short of the standard of proof held requisite by this Court on many occasions. On the other hand, the testimony of the proponent as to testatrix' condition on the date she executed this will is clear, positive and uncontradictory. While I disagree with a majority of this Court that the burden was on the proponent, yet even if it were, in my opinion, proponent has fully and completely sustained his burden.

Furthermore, the majority opinion places upon the proponent the burden of proof under these circumstances without any precedent in the law. Chancel-

---

[7] The chancellor found the contrary to be the fact. To apply *Landis,* the majority must act as the fact finder and find that testatrix was mentally incapable prior to June 20, 1955 and, in so doing, set aside the chancellor's finding for which there is supporting evidence.

232

lors in future will contests can only be confused by this Court's instant decision.

The dispute of fact as to testatrix' testamentary capacity on June 20, 1955—the date of execution of this will—is far from substantial under our prior decisions and the chancellor's decree refusing an issue d.v.n. was eminently proper. I would sustain the chancellor in his refusal of an issue d.v.n. believing as I do, that the position taken by the majority of this Court in reversing the chancellor is supported neither by precedent nor by facts on this record.

Mr. Justice BELL and Mr. Justice BOK join in this dissenting opinion.

