## Politis Estate

*Roy H. Davis*, for proponent.

*Richard G. Segal*, for contestants.

SAYLOR, J., January 15, 1969.—In this will contest Karlis Griverts, nephew of decedent, and his wife, Zenija, appealed on July 5, 1967, from the probate on June 19, 1967, of a holographic will in the Latvian language dated May 9, 1967, purportedly executed by Janis Politis, whereby he devised his estate to Edgar Brolis. Mrs. Griverts had been named sole heir of decedent in his will dated October 3, 1963, and probated on June 13, 1967. Letters Testamentary issued to her were revoked upon probate of the later writing. On June 19, 1967, Letters of Administration c. t. a. were issued to Edgar Brolis. Karlis Griverts claimed an interest in insurance policies bequeathed to Brolis.

Decedent died on June 12, 1967, at age 73. He was an immigrant from Latvia and had not become capable of writing in English. The probated will was written in the Latvian language, and a translation into Eng-

lish was made by Janis A. Silins, Pastor of the Latvian Evangelical Lutheran Church of St. John in Philadelphia. Added at the end of the writing, prior to probate, is a statement in Latvian, reading in English as follows:

"I, undersigned, Niklass Lazdins, residing 531 N. 7th Street, Philadelphia, Pa., with my signature certify that above mentioned handwriting and signature is original made of his own".

In the petition for citation three reasons for the appeal were set forth and the court was requested to direct an issue for trial by jury on the following questions of fact:

(1) Whether or not at the time of execution decedent was a person of sound mind.

(2) Whether or not the said writing was procured by undue influence, duress and constraint placed upon said decedent by Edgar Brolis.

(3) Whether or not the said writing was procured by fraud upon said decedent by Edgar Brolis, and

(4) Whether or not the alleged will of May 9, 1967, was executed in the handwriting of decedent as alleged and/or whether the signature is that of decedent.

Upon answer filed, a hearing was held by a judge without a jury. The sole question then submitted by the contestants was whether the writing was a forgery. The other grounds upon which the appeal was based were abandoned.

There were no attesting witnesses to the will. The record of the register of wills was offered. The proponent called four persons to testify as to the handwriting of the will. All of them stated that it was written and signed by decedent. Several witnesses for the parties were not competent in the English language and the services of an interpreter were used.

Nicklass Lazdins testified that he had known the decedent for 18 years, had received letters from him

regarding radio broadcasts, and had seen him write his name as recently as May 8, 1967, when decedent opened a savings account and also executed papers in his lawyer's office in connection with an accident claim settlement. At the request of Edgar Brolis, Mr. Lazdins wrote the statement in the Latvian language at the bottom of the will. This witness had received at the Teachers College in Latvia the degree of Master in Education and had taught school for 15 years. His subjects included calligraphy, which means "beautiful writing", such as is employed by older Latvian people. The witness also stated that the probated will is an example of such handwriting which must be written carefully and slowly. He said, "The letters are in much the same line, the letters are of regular size, very labored we can see". The difference between this kind of writing and other methods of writing is that in the latter the letters are not regular. Mr. Lazdins stated also that decedent's eyes were poor and he had to use thick glasses but still had difficulty seeing.

Janis A. Silins, the pastor, testified that he had known decedent since 1950 as a member of his church at two different times. The witness had seen decedent's writing on Christmas greeting cards. He identified his signature on the probated will (Proponent's Exhibit A) and on an application for membership in the witness's church made by decedent in 1964 (Proponent's Exhibit B). The witness stated that decedent had been a carpenter, and in later years a helper and a dishwasher at a restaurant. In Latvia he had served in an army department store.

Both of the witnesses above named appeared before the register of wills and proved the signature of decedent to the probated writing.

There were two additional witnesses for the proponent.

Edgars Brolis testified that as a grocer from whom decedent made purchases he had known him since 1951 or 1952. He had cashed for decedent checks which the latter endorsed and wrote out checks for Latvian relief for decedent's use, as decedent did not have a checking account. This witness also saw Christmas and birthday greeting cards written by decedent and identified as decedent's the signature to the probated will.

Called as on cross examination, Mr. Brolis stated that he had had a disagreement with decedent over a Neptune Club matter, but that it had been settled and thereafter he and decedent continued to be friends. He saw decedent in the hospital and at his request brought his will to him there. Both men read the will and then Brolis took it away with him on being asked to do so. Edgars Brolis produced the will after decedent's death and had Mr. Lazdins sign the statement at the end thereof.

Augusts Ausmanis testified that he had known decedent since 1952, belonged to and was treasurer of the same church as decedent and lived in the Latvian community where decedent lived. He said further that in the 1950's decedent was secretary of the church and as such over a period of two or three years kept a record of the membership, which the witness saw every Sunday. This record book (Proponent's Exhibit C) was identified as in the handwriting of the decedent. This witness also received greeting cards from decedent (Proponent's Exhibit D) and identified the signature to the probated will as decedent's. He had seen decedent write and knew his handwriting. Since 1964, he had not seen decedent but had not quarreled with him.

For the contestants three witnesses testified.

Zenija Griverts said that she was the wife of decedent's nephew, Karlis Griverts, and had known decedent since she came to this country in 1951. She saw him sign Christmas cards and had received such cards

from him. She identified his signature to carbon copies of various papers executed by decedent in applying for naturalization, for compensation, and for orders for shipment of parcels to Latvia (Contestants' Exhibits 1 to 6, inclusive). She had obtained these papers at decedent's home after his death. She said that decedent's education was six years in grammar school and four years in trade school. His highest rank in the army was that of sergeant. He could not read English.

As to Edgars Brolis, she had known him since 1953 and had never seen him with decedent socially, although she was at decedent's apartment twice a week, and when she was in the hospital every day she never saw Brolis there. She never knew of anything that Brolis did for decedent. However, she stated that her husband had borrowed $1,000 from decedent to go into business and had paid it back. She was shown her husband's note for $1,150, of which $500 had been repaid to decedent.

This witness was away from Philadelphia and at Biloxi, Mississippi from November 1965 until August 1967. During the latter year she did not attend decedent's birthday party, although she made brief visits to Philadelphia when she saw decedent.

Albert S. Fein, Esq., a member of the Philadelphia Bar, testified that in June 1962 and in 1963 he represented decedent and wrote for him the will dated October 3, 1963 (Contestants' Exhibit 7). The witness stated that decedent never told him that he wanted to write a new will. Mr. Fein handled an accident claim for decedent on which settlement was made in the witness's office on May 8, 1967. At that time decedent and Mr. Lazdins were present, and the attorney saw decedent sign the settlement and other papers. Mr. Fein said that he did not believe the signature to the probated will was decedent's signature; that it didn't look like his other signatures.

Mrs. Lina Sprogis testified that she had known decedent since 1952 and that they had exchanged greeting cards. When shown the probated will (Proponent's Exhibit A) and asked if the signature was decedent's, she said: "I am doubting it". She added that decedent usually signed on the right side. The witness also spoke of a party at decedent's apartment on May 9, 1967, when decedent told her that he had not yet prepared a will to take care of the money he received from the accident litigation. She said she had known Edgars Brolis for 12 years and that he was never at decedent's parties. She did not know if decedent and Brolis "went out together". With respect to the greeting cards (Proponent's Exhibit D) the witness said the handwriting could be decedent's but she thought that the body of the will was in decedent's handwriting.

Jacque Panko Whaumbush, an evidence technician and document examiner for over 28 years, testified for the contestants that he was a graduate of the three year course in the Institute of Applied Science, in Chicago, and had examined thousands of documents. Since 1959 he has worked for the City of Philadelphia, the local register of wills and the Civil Service in New Jersey. He has worked in the crime laboratory of this city and since 1940 has handled cases of his own, although his principal work with the city is now in fingerprints. He is a member of the Society of Questioned Documents Advisors. There was challenge to the qualification of this witness as an expert on handwriting, but the court permitted him to testify. No other witness was produced as an "expert".

Mr. Whaumbush gave extended testimony and was thoroughly cross-examined. He produced a chart which shows in "blown-up" fashion the questioned signatures of decedent at the beginning and at the end of the probated will. Also on the chart are the enlarged signatures on contestants' Exhibits 3, 4, 5 and 6, the stan-

dard signatures. The witness stated that there are vast differences between the two sets of signatures and declared the questioned signatures to be forgeries.

The witness said that he had examined a total of 15 documents of which some were "no good" although similar to the 6 in evidence. The substance of his testimony was that in the questioned signatures there was a separation of some of the letters in the decedent's name, while in the standard signatures there was a flow or continuity of writing where that did not occur. Furthermore, at the end of the name "Politis" in the standard signatures there was a decline or falling off of the final letters that was not evident in the questioned signatures.

Mr. Whaumbush's testimony extends over 100 pages of the transcript. He went into considerable detail in both direct and cross examination. He stated that in the questioned signatures there was evidence of "labor" and of "drawing"; that the words were "broken" in many places; that the age of the writer makes no difference in the character of the writing, while a nervous condition does; that speed in writing, or impatience, or hurry of the writer does not; that the signatures in the several exhibits were all similar but not alike; that they were alike but not identical; that single letters in the signatures differed in many of the writings; and that the writing in the probated document being in Latvian could not be studied by him as it could be were it in the English language.

Despite the testimony of Mr. Whaumbush, a meticulous examination of the various specimens of decedent's handwriting shows that there is little if any difference in the signatures that are considered standard and those that are questioned.

Proponent's Exhibit B, decedent's application for admission as a member of the Latvian Church, was iden-

tified by the pastor, Janis A. Silins, as having been given to him in his office by decedent on January 12, 1964. Mr. Silins did not remember whether the document was written or signed in his presence, but he knew decedent wrote it as he knew decedent's writing. The document contains data relating to births, marriages, etc., in decedent's family. On this exhibit is the marking of a cross, which Mr. Silins said indicates decedent's death, the date being June 12, 1967. It was on the basis of this application that decedent was again accepted as a member of Mr. Silins' congregation.

When shown Exhibit B, which he had first examined during the trial, Mr. Whambush stated that the signatures of "Janis Politis" appearing on the exhibit were not those of decedent. But he said that the exhibit "was written by the same man who wrote the purported will". He also stated that letters in the name as they appear in the document were almost identical with similar letters in decedent's name in the probated will. Both are forgeries in the opinion of Mr. Whaumbush. This witness for the contestants stated finally that "Exhibit B, I believe, shows all indications that the person who wrote that Exhibit B, whether Mr. Politis had someone write that, I don't know, but the person who wrote that Exhibit B also wrote those signatures here". When asked by the court if he meant the two questioned signatures on the probated will, Mr. Whaumbush said, "That's what I was coming to, sir".

Since it is beyond the wildest stretch of the imagination that a forger of a 1967 will would also in the year 1964 have forged the application of the alleged maker of that will for admission to a church, it must seem obvious that if decedent wrote the application he also wrote the will. And it has been proven to the satisfaction of the hearing judge that decedent wrote and signed the application (Exhibit B).

There is further proof that the probated will is in decedent's handwriting and that he executed it. Exhibit C, the record book of the "Second Latvian Church", to which decedent once belonged, was identified as the book kept by decedent as secretary. In it are listed the names of the members of the congregation written in decedent's hand. An examination of decedent's name written in that book shows that it is similar to his name written at the two places in the probated will, at the beginning and at the end.

There is also the check received by decedent in the settlement effected by Mr. Fein (Contestants' Exhibit 10). The endorsement on that check is acknowledged by the contestants to be decedent's. Again, an examination of that signature convinces a lay person that it is similar to the signature to the probated will. Mr. Whaumbush said that a number of the letters were similar.

The fact that in his second will, the probated will, decedent gave his estate to his friend of over 15 years rather than to a nephew is no argument against the validity of his gift.

Mr. Silins, the pastor, said that decedent asked him to visit him. When he did, Mr. Silins was told by decedent that he was losing his friends and that "even my nephew forgets me".

Proponents contend that it was unlikely that decedent, formerly a carpenter and in his last years a dishwasher in a restaurant, could have written the probated document. It is clear from unquestioned items among his writings that he could write clearly and legibly in the Latvian language. That at times when he signed his name the appearance of his letters was not always uniform is unquestionably due to at least two reasons: First, he took pains to write down data and to sign his name when he practiced calligraphy, that is, "beautiful writing", and, second, he was less careful,

more casual, when he put his signature to such items as the documents which had to do with sending packages to Latvia. Moreover, the variations in the appearance of the "J" in Janis and the "P" in Politis in the documents reflect the divergence in shape and fashion between those names which are merely names and when they are signatures. In all the specimens of the signature or the mere writing of his name by decedent, those letters appear in two different shapes, both in the standard and in the questioned documents. There is a difference between calligraphy and free-hand writing.

It is argued by contestants that as decedent had a lawyer it was reasonable and natural that he would employ him to write a second will for him if he wanted to revoke the one the lawyer had written and witnessed for him. There was testimony that decedent was displeased that he had not received a greater recovery in the action the lawyer handled for him. Whether or not he was justified in that is not important. That he could express himself in writing in the Latvian language was proven.

That he was not of sufficient education to use the language he employed in the will is properly argued. But because a man lacking knowledge of English serves as a carpenter and ultimately as a dishwasher in a country alien to that of his birth it does not follow that in his own language he must be unable to express himself. The calligraphy he employed was acquired in his youth in Latvian schools. The substance of what he wrote may have come from a form book or he may have been provided with it otherwise.

As was said in Henry's Estate, 276 Pa. 511 (1923), at page 514:

" 'A variance in a signature is not necessarily proof of its being a forgery. Dissimilitude may be occasioned by a variety of circumstances, by the state of health

and spirits of the writer, by the material, by his position or by his hurry or care' ".

Mr. Whaumbush, called by the contestants as an expert, did not say whether decedent's writing or any writing as to which he testified was made by a ball point or a regular pen, whether the signatures were in ink or appeared in carbon. Nor did he use or, when questioned, did he show an expert's knowledge of the materials of the profession of examiner of disputed documents. These matters are of elementary importance. His testimony is of little value to the court. In any event, standing alone it will not sustain a finding of forgery in the face of direct and credible evidence: DiLaurentiis Estate, 323 Pa. 70 (1936) ; McWilliams' Estate, 259 Pa. 526 (1918) ; and Henry's Estate, 276 Pa. 511 (1923).

The argument of the proponents that Edgars Brolis as a former notary public in Latvia had written wills there and was therefore probably the scrivener of the probated will is without merit. We have no evidence of Brolis's handwriting. We do know that he, a Latvian, a notary public at home, became a grocer in America.

It is found as a fact that decedent wrote the probated will and executed it. As the charge of undue influence by Edgars Brolis or any other person is not pressed but has been abandoned, it is the question of forgery alone that is before the court. Forgery has not been proved. It is beyond belief that the writing that has been probated was written by Brolis and that he signed the name of the decedent at its end.

Accordingly, the appeal is dismissed and the record is remanded to the register of wills.